[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-17755
_____

D.C. Docket No. 1:14-cv-00590-C

BARCLIFF, LLC,
d.b.a. Radcliff/Economy Marine Services,

Plaintiff - Appellant,

versus

M/V DEEP BLUE, IMO NO. 9215359,
her engines, apparel, furniture, equipment,
appurtenances, tackle, etc., in rem,

Defendant - Appellee,

ING BANK N.V.,
P. O. Box 1800 ALP B.02.050
Amsterdam 1000 BV Netherland,

Intervenor - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Alabama
_____

(November 30, 2017)

Before ED CARNES, Chief Judge and BLACK, Circuit Judges, and MAY,[*]
District Judge.

BLACK, Circuit Judge:

The M/V Deep Blue is a pipe-laying vessel deployed in the Gulf of Mexico.

In late 2014, the Deep Blue required a routine refueling.  Its owner contacted a

global marine fuel supplier.  The supplier agreed to sell the fuel and deliver it to

the Deep Blue at the Port of Mobile, Alabama.  Rather than fulfill the order out of

its own stocks, the supplier purchased the fuel from an affiliate.  The affiliate, in

turn, subcontracted with Plaintiff-Appellant Barcliff, LLC, d/b/a Radcliff/Economy

Marine Services (Radcliff), a Mobile-based maritime fuel provider, to supply and

deliver the fuel.  Radcliff rendered performance and fueled the Deep Blue in

November 2014.

This otherwise ordinary transaction ultimately became a problem for

Radcliff because, before any money changed hands, the global marine fuel

conglomerate collapsed into bankruptcy.  Radcliff found itself in the position of

_____

[*] Honorable Leigh Martin May, United States District Judge for the Northern District of
Georgia, sitting by designation.

2

having supplied several hundred metric tons of fuel on the credit of a now-insolvent counterparty. Radcliff asserted a maritime lien on the Deep Blue in a bid to recover directly from the ship, giving rise to this litigation.

After a bench trial, the district court determined Radcliff did not have a lien on the Deep Blue. Instead, a lien had arisen in favor of the global fuel supplier, and was duly assigned to ING Bank N.V. (ING), an intervenor in the suit. Radcliff appeals, and we affirm.

## I. BACKGROUND

The significance of the contractual structure of the sale outlined above will become clear in the course of our analysis. Accordingly, we begin by introducing the parties to the transaction in relation to their contractual counterparties.

A. *The Sequence of Contracts*

*1. Technip purchases bunkers from O.W. UK*

Technip UK Limited (Technip) is a U.K.-based company and the owner of the Deep Blue. Since 2001, Technip has used the Deep Blue to lay pipe for oil rigs in the Gulf. The Deep Blue requires periodic refueling. Each time, Technip's Scotland-based procurement team solicits bids from a handful of international fuel suppliers. The suppliers respond with price quotes, and Technip selects the most appropriate proposal.

3

O.W. Bunkers (UK) Limited (O.W. UK), also a U.K. entity, is a member of the O.W. Bunker Group, a global fuel supply conglomerate.  On October 22, 2014, Technip sent out a request for quotations to O.W. UK and two other suppliers, seeking bunker fuel[1] for the Deep Blue in the Port of Mobile, Alabama.  After reviewing the bids, Technip awarded the supply contract to O.W. UK, whose offer, at $824 per metric ton, was the least expensive.[2]  Payment was to be due within thirty days of delivery.

*2. O.W. UK purchases bunkers from O.W. USA*

Now obligated to supply the Deep Blue in the Gulf of Mexico, O.W. UK entered into a second purchase and sale contract in order to procure the 850 metric tons of bunkers it had agreed to sell to Technip.  This time, O.W. UK was the buyer of the fuel and O.W. Bunker USA, Inc. (O.W. USA) was the seller.  O.W. USA, a Houston-based sibling company of O.W. UK, agreed to sell 850 metric

---

[1] Bunker fuel (or "bunkers") is synonymous with maritime fuel.  *See Bunker fuel*, Webster's Third New International Dictionary, Unabridged, http://unabridged.merriam-webster.com/bunker%20fuel (last visited Nov. 13, 2017) (defining bunker fuel as "any of various fuel oils used especially on ships").  This opinion uses the terms interchangeably.

[2] O.W. UK agreed to sell fuel to Technip; it did not agree to become Technip's agent or broker to bind Technip to a fuel purchase agreement with a third party.  The sales order confirmation listed O.W. UK as seller and was addressed to Technip as purchaser and it stated the price, date of delivery, and port of delivery, but there was no indication of any delegation of authority to purchase on Technip's behalf.  Evidence presented at trial indicated that, consistent with their purchaser-seller relationship, if Technip had had any quality or quantity issues, they would have been addressed with O.W. UK, and not with any downstream local supplier-subcontractors retained by O.W. UK.  This is also Radcliff's understanding, as its pretrial stipulations indicate.

tons of bunker fuel to O.W. UK for $823.30 per ton, with delivery to be made to the Deep Blue in Mobile.

### 3. O.W. USA purchases bunkers from Radcliff

O.W. USA had agreed to sell O.W. UK 850 tons of fuel, but the fuel would not come from its own stocks. Rather, O.W. USA added a final link to the chain of contracts by retaining Radcliff to supply the bunkers. Radcliff agreed to sell the fuel to O.W. USA and deliver it to the Deep Blue at a price of $823 per ton, payment due within thirty days.

## B. The Fueling

After the contractual arrangements were worked out, O.W. USA emailed Radcliff and put Radcliff in touch with the Chief Engineer of the Deep Blue, Ian Ladyka, to coordinate delivery. Radcliff communicated with Ladyka, rather than O.W. USA, from that point on with respect to the logistics of the fueling.

Radcliff fueled the Deep Blue outside the Port of Mobile on November 1, 2014. When the fueling was complete, Ladyka signed a bunker delivery certificate acknowledging that the 850 tons of fuel had been conveyed. Each seller sent an invoice to its respective buyer at their agreed prices: Radcliff to O.W. USA for the fuel sold to it and delivered to the Deep Blue; O.W. USA to O.W. UK; and O.W. UK to Technip.

5

*C. ING Bank and the Collapse of the O.W. Bunker Group*

The ship now fueled and having recommenced its operations, all that remained was settlement. Had everything gone according to plan, Technip would have paid O.W. UK $700,400 for 850 tons of fuel at $824 per ton; O.W. UK would have paid O.W. USA $699,805; and O.W. USA would have paid Radcliff $699,550. But none of these sums was remitted because the O.W. Bunker Group, the global marine fuel conglomerate of which O.W. UK and O.W. USA were members, imploded. The Group's parent company filed for bankruptcy in its native Denmark on November 7, 2014, one week after the Deep Blue was fueled, and concurrent bankruptcy cases were opened for its subsidiaries, including O.W. UK and O.W. USA, in jurisdictions around the world. Relevant here, O.W. USA's proceeding commenced on November 13, 2014, in the District of Connecticut. *See* Chapter 11 Voluntary Petition, *In re O.W. Bunker USA Inc.*, No. 14-51722 (Bankr. D. Conn. Nov. 13, 2014). Thus, Radcliff remained unpaid.

An overview of the O.W. Bunker Group explains the involvement of ING in this case. The O.W. Bunker Group was founded in Denmark in 1980 and grew to be one of the world's largest maritime fuel providers. The Group's operations consisted of a physical supply division, which provided bunkers directly from the Group's onshore stocks using its own fleet of ships, and a trading and reselling division, which bought fuel from third parties and sold it at a markup.

6

In December 2013, eleven months before the transaction at issue in this case, members of the O.W. Bunker Group, including O.W. UK and O.W. USA, entered into a $700 million revolving credit agreement with ING and a syndicate of other lenders to supply working capital. The credit was secured by O.W. Bunker Group's receivables due from customers around the world pursuant to a security agreement governed by English law (the Security Agreement).

Over the course of 2014, the Group drew down nearly the entire facility, which empowered ING to take its security, namely, payments that third parties owed to members of the Group. ING began to do so pursuant to a cooperation agreement between ING and the bankruptcy estate of O.W. UK, by which ING became entitled to collect on O.W. UK's outstanding receivables, with all recoveries to be paid into ING accounts. Among them was Technip's unpaid invoice for the fuel supplied to the Deep Blue.

*D. This Suit*

Having received no payment, and with its contractual counterparty, O.W. USA, in bankruptcy, Radcliff filed this suit in the Southern District of Alabama on December 19, 2014, seeking a lien on the Deep Blue so that it could collect from the ship. Notwithstanding the fact that its contractual obligation to supply the ship had been owed to O.W. USA, not to Technip, Radcliff contended that it had supplied the vessel and not been paid, so it was entitled to a lien. Technip made a

restricted appearance for the purpose of defending the claim against the vessel. Technip was willing to pay for the fuel supplied to its ship, but wanted to be sure it only paid once, since its contractual debt was to O.W. UK, not to Radcliff, with whom it had no contractual relationship at all. Consequently, Technip deposited $705,529.50 into the registry of the court, equal to the value of the invoice from O.W. UK for the fuel plus interest, to be distributed according to the court's ultimate determination.

In April 2015, ING intervened in the suit. ING alleged that O.W. UK supplied the fuel to the ship, albeit using subcontractors, and Technip had not yet paid O.W. UK, so O.W. UK, not Radcliff, had a lien on the Deep Blue. In addition, ING had taken title to O.W. UK's accounts receivable as a result of the credit arrangements. Thus, ING asserted that it, not Radcliff, was entitled to the money Technip paid into the court.

The parties consented to try the case before a magistrate judge.[3] Following a two-day bench trial, the court entered an order concluding that Radcliff did not possess a lien on the ship. O.W. UK, on the other hand, did have a lien, and had duly assigned it to ING. The court entered judgment against Radcliff and in favor of ING and directed that the full amount Technip paid into its registry be disbursed to ING. Radcliff appealed.

---

[3] As such, we have appellate jurisdiction under 28 U.S.C. § 636(c)(3).

8

## II. STANDARD OF REVIEW

When a district court sitting in admiralty conducts a bench trial, we review the court's factual findings for clear error and its conclusions of law *de novo*. *Venus Lines Agency, Inc. v. CVG Int'l Am., Inc.*, 234 F.3d 1225, 1228 (11th Cir. 2000).

## III. DISCUSSION

"A maritime lien is a special property right in a ship given to a creditor by law as security for a debt or claim, and it attaches the moment the debt arises." *Crimson Yachts v. Betty Lyn II Motor Yacht*, 603 F.3d 864, 868 (11th Cir. 2010) (quotations omitted). The Federal Maritime Lien Act (FMLA)[4] determines when a person is entitled to such a lien. It reads:

> [A] person providing necessaries to a vessel on the order of the owner or a person authorized by the owner . . . has a maritime lien on the vessel . . . .

46 U.S.C. § 31342(a). We have held that under a plain reading of the statute, "to obtain a maritime lien, a person must: (1) provide necessaries; (2) to a vessel;

---

[4] In 1989, FMLA was recodified under the heading "Commercial Instruments and Maritime Liens." *See* Coast Guard Authorization Act of 1989, Pub. L. 101-225, 103 Stat 1908. The parties and the district court refer to the statute as "CIMLA," but this opinion will retain the act's original title. The amendments did not change the substance of the statute. *Crimson Yachts*, 603 F.3d at 872.

9

(3) on the order of the owner or agent."[5] *Galehead, Inc. v. M/V Anglia*, 183 F.3d 1242, 1244 (11th Cir. 1999).

In this case, the parties agree Radcliff satisfied the first and second elements of the statute when it provided 850 metric tons of bunker fuel to the Deep Blue in Mobile, Alabama. The subject of their dispute is whether Radcliff supplied the ship "on the order of the owner." If not, then Radcliff has no lien.

ING's asserted lien, on the other hand, requires us to answer two questions. First, did O.W. UK actually "provide necessaries" to the Deep Blue, even though it subcontracted the job to O.W. USA, and in turn to Radcliff? Second, even if a lien arose in O.W. UK's favor, did O.W. UK assign the lien to ING? If we answer both those questions in the affirmative, the district court was correct that ING has a lien on the Deep Blue.

We begin with Radcliff.

## A. Whether Radcliff Has a Lien

### 1. The general rule: A subcontractor does not receive a lien

As noted above, the parties agree that neither O.W. UK nor O.W. USA was Technip's agent or broker.[6] Thus, Radcliff cannot aver that Technip authorized

---

[5] *Sweet Pea Marine, Ltd. v. APJ Marine, Inc.* adds an additional requirement that the necessaries be supplied "at a reasonable price," 411 F.3d 1242, 1249 (11th Cir. 2005), but that is not at issue in this case.

[6] *See supra* note 2.

those entities to establish an agreement between Radcliff and Technip. Rather, as we have discussed, each party entered into a separate contract—Technip with O.W. UK, O.W. UK with O.W. USA, and O.W. USA with Radcliff. Radcliff's case turns, then, on whether it can show that it acted "on the order of the owner," Technip, in some more indirect way.

To that end, we first address Radcliff's contention that the district court erred in refusing to follow *Marine Fuel Supply & Towing, Inc. v. M/V Ken Lucky*, 869 F.2d 473 (9th Cir. 1988). In Radcliff's view, this nearly three-decades-old Ninth Circuit case "applies with dispositive force" because of its ostensible factual similarity. Brief of Appellant at 15. In *Ken Lucky*, Bulkferts, a subcharterer of the ship the Ken Lucky, ordered its managing agent, Eurostem, to procure fuel for the ship.[7] *Ken Lucky*, 869 F.2d at 475. Eurostem contacted Brook which, in turn, instructed Gray to place an order with Marine Fuel. Marine Fuel supplied the ship, billed Gray, and sought payment from Brook, but Brook went bankrupt. Marine Fuel asserted a lien on the vessel. *Id.* The district court wanted to know whether Brook was also Bulkferts's agent, in which case Marine Fuel might be said to have performed the work on the order of "a person authorized by the owner." *Id.* at 476. The Ninth Circuit, however, concluded such a determination was unnecessary because the defendants had admitted that "Marine Fuel sold marine fuel and

---

[7] Full names of the entities are omitted for clarity.

11

bunkers to Bulkferts." *Id.* Because the parties had "agree[d] that the order originated from Bulkferts" and Bulkferts accepted the fuel when Marine Fuel delivered it, Marine Fuel obtained a lien on the ship. *See id.* at 477. In essence, the court decided that the appellees' admission satisfied the order-of-the-owner requirement.

Radcliff appears to read *Ken Lucky* as standing for the proposition that any time an owner orders fuel for its ship, and that fuel is accepted from the third-party supplier by a member of the crew, a maritime lien arises in favor of the supplier— even if the owner ordered the fuel from a different entity. That view of *Ken Lucky* is strained because of the appellees' admission noted above. *See id.* ("[W]e need not reach the question whether the district court's conclusion that Brook was not Bulkfert's [sic] agent is erroneous because appellees have already admitted that the fuel and bunkers were sold *to Bulkferts*." (emphasis in original)). We read the case as highly dependent upon that particular factual stipulation, which is not present here. But more fundamentally, we have difficulty comprehending how the district court here could have committed an error of law in declining to follow *Ken Lucky*, as it is not binding law in this Circuit. *See United States v. Rosenthal*, 763 F.2d 1291, 1294 n.4 (11th Cir. 1985) ("[A]ny decision of another circuit, published or unpublished, is only of persuasive value.").

Radcliff's rejoinder is that *Ken Lucky* "mirrors this Circuit's broad[ ] interpretation of 'order of the owner.'"  Brief of Appellant at 14.  That is, whereas the district court invoked the principle of *stricti juris*,[8] it should have construed the FMLA broadly, in which case it would have found *Ken Lucky* persuasive.  Radcliff cites *Atlantic & Gulf Stevedores, Inc. v. M/V Grand Loyalty*, 608 F.2d 197, 202 (5th Cir. 1979),[9] for the proposition that FMLA is to be given a liberal application. Some of the Court's statements in that case might appear on their face to cast doubt on the time-honored principle that "[m]aritime liens are governed by the principle *stricti juris* and will not be extended by construction, analogy or inference."[10] *Inbesa Am., Inc. v. M/V Anglia*, 134 F.3d 1035, 1037 n.3 (11th Cir. 1998)

---

[8] "Of strict right of law; according to the exact law, without extension or enhancement in interpretation."  *Stricti juris*, Black's Law Dictionary (10th ed. 2014).

[9] In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

[10] Specifically, in *Grand Loyalty*, the Court opined that, in light of the legislative history of the 1971 amendments to the FMLA, the Act "is not to be viewed through the constricting glass of Stricti juris, or as some would suggest, Strictissimi juris."  *Grand Loyalty*, 608 F.2d at 201.  The case centered on the question of which individuals have authority to procure necessaries such that a maritime lien would attach.  The Court cited legislative history indicating Congress was concerned with the problem of materialmen furnishing necessaries to a vessel without having the time or ability to check if the charterer and the owner had entered into a "no lien" clause, the effect of which would be to limit the agency of the charterer and specifically to prevent him from ordering necessaries that would result in a lien under the statute.  *Id.* at 201–202 n.7 (citing 1971 U.S.C.C.A.N. 1364–65).  From the perspective of the materialman, it would be impossible to know whether or not the charterer's authority was so limited.  Congress enacted the 1971 amendments to provide a presumption in such situations, analogous to the apparent authority rule in agency law.  *Id.*  However, it is important to note that *Grand Loyalty* did not involve the meaning of "on the order of the owner," but only "a person authorized by the owner."

(quotations omitted). However, our subsequent decisions have clarified this Court's position. In *In re Container Applications International, Inc.*, we held that *Grand Loyalty*'s sweeping statement is confined to its facts. 233 F.3d 1361, 1366 (11th Cir. 2000) ("*Grand Loyalty* simply held that it was unnecessary to apply this rule of construction [*stricti juris*] because it was clear that Congress intended, through the 1971 amendments, to make it easier and more certain for stevedores performing traditional services to be protected."). Indeed, we expressly rejected the argument that *Grand Loyalty* "requires that we interpret all provisions of the FMLA liberally," stating that "[w]e do not find this to be the holding in *Grand Loyalty*." *Id.*; *cf. Crimson Yachts*, 603 F.3d at 872 ("Like its predecessors, Congress passed the current version of the Federal Maritime Lien Act to resolve misunderstandings that had developed about the meaning of the Act; Congress did not intend to effect any dramatic substantive change.").

Accordingly, we decline Radcliff's invitation to read "on the order of the owner" so broadly. Were we presented with an issue of first impression, we might also question the practical utility of Radcliff's desired interpretation. *Stricti juris* or not, however, we have already had occasion to construe "on the order of the owner," and the result we reached is inconsistent with Radcliff's position. *Galehead, Inc. v. M/V Anglia*, 183 F.3d 1242 (11th Cir. 1999), is our leading case in this area and it squarely controls this appeal. In light of *Galehead*, it cannot be

14

said that Technip ordered Radcliff to supply the fuel to the Deep Blue within the meaning of the FMLA.

In *Galehead*, we considered three purported liens on the M/V Anglia arising from three occasions on which fuel was supplied to it. First, in August 1995, Genesis, the charterer, contacted Polygon to obtain bunkers.[11] *Id.* at 1244. Polygon subcontracted with Asamar, and Asamar found a supplier, which supplied and delivered the fuel to the ship. Asamar paid the supplier, but never received payment. It assigned its claim to Galehead, a collection agency. *Id.* The same sequence of events occurred again in September 1995, and Asamar assigned its second claim against the ship to Galehead as well. *Id.* In October 1995, Genesis once again sought fuel for the Anglia. This time, Polygon bypassed Asamar and subcontracted directly with the supplier. Once again, Genesis did not pay. Polygon assigned its claim to Galehead. *Id.*

Galehead brought suit seeking payment and asserted three liens on the ship, the first two assigned by Asamar and the third by Polygon. We held Asamar had no liens to assign to Galehead because it did not act "on the order of the owner;" rather, Asamar acted at Polygon's request. *Id.* at 1245 ("Asamar did not provide the bunkers on order of the owner or an authorized agent. Asamar provided the bunkers at Polygon's request, and Polygon is not [an agent of Genesis].").

---

[11] Once again, full names of the entities are omitted for clarity.

15

Polygon, however, was in direct privity with Genesis, and clearly acted on Genesis's orders. *Id.* Although Polygon subcontracted to a third party rather than supply the vessel with its own personnel, it nevertheless satisfied all three elements of the maritime lien statute: Polygon provided necessaries (the fuel) to the ship (the Anglia) on the order of the owner (Genesis). *Id.* Galehead was entitled to one lien on the Anglia, that assigned by the general contractor, Polygon, but it was not entitled to the liens ostensibly assigned by the subcontractor, Asamar.

*Galehead* stands for the rule in this Circuit: Where the owner directs a general contractor to provide necessaries to its vessel, a subcontractor retained by the general contractor to perform the work or provide the supplies is generally not entitled to a maritime lien. *Id.* at 1245; *accord Cianbro Corp. v. George H. Dean, Inc.*, 596 F.3d 10, 17 (1st Cir. 2010); *Lake Charles Stevedores, Inc. v. Professor Vladimir Popov MV*, 199 F.3d 220, 229 (5th Cir. 1999); *S.C. State Ports Auth. v. M/V Tyson Lykes*, 67 F.3d 59, 61 (4th Cir. 1995); *Port of Portland v. M/V Paralla*, 892 F.2d 825, 828 (9th Cir. 1989). This is because, absent facts indicating the owner has designated the general contractor as its agent to procure necessaries on its behalf, a general contractor does not have the authority to bind the ship.[12] *See*

---

[12] The statute does not list a general contractor as a party presumed to have authority to bind the ship. *See* 46 U.S.C. § 31341(a). It is, of course, entirely possible that the facts of a case would show that the general contractor was in an actual agency relationship with the vessel, in which case it would have authority to bind it. *See Galehead*, 183 F.3d at 1245 n.2. However, as noted above, *see supra* note 2, the parties stipulated in this case that neither O.W. UK nor O.W.

16

*Port of Portland*, 892 F.2d at 828 ("It is the general rule that a general contractor does not have the authority to bind a vessel."). As such, the subcontractor is merely a contractual counterparty of the general contractor; it has no relationship with the owner. It is the general contractor that, on the order of the owner, provides the necessaries to the ship. Whether it does so with its own employees and supplies or by retaining a subcontractor is immaterial. Absent certain extraordinary circumstances as discussed below, a subcontractor cannot meet the third statutory element required to obtain a maritime lien. *Id.*; 46 U.S.C. § 31342(a).

Under the general rule as stated, Radcliff does not have a maritime lien on the Deep Blue. Radcliff acted on the order of O.W. USA, not Technip.

*2. The exception: Significant and ongoing involvement*

However, *Galehead* recognizes an exception to the general rule. Even where the general contractor is not an agent of the owner, and the owner does not initially order the subcontractor to perform the work, it might still be said that the owner "somehow authorized" the work if it "was sufficiently aware of, and involved in, [the] work that it might be said that [the subcontractor] was working for [the owner]." *Galehead*, 183 F.3d at 1245. Specifically, we held that "[w]here

USA was an agent of Technip. To the extent Radcliff suggests otherwise, the district court did not clearly err in so finding.

17

the level of involvement between the owner and the third-party provider was significant and ongoing during the pertinent transaction," a question of fact may arise as to whether the third-party provider (i.e., the subcontractor) in effect performed the work on the order of the owner.  *Id.*

   *Galehead* arrived at the significant-and-ongoing-involvement exception by looking to prior Eleventh Circuit cases on the subject.  On the one hand, our Court has discerned certain circumstances in which a subcontractor could obtain a lien even though the general contractor was the one that took the official order from the owner.  Those cases involved extensive maintenance, such as painting, coating, and cleaning, *Marine Coatings of Ala., Inc. v. United States*, 932 F.2d 1370 (11th Cir. 1991), or repair work, *Stevens Tech. Servs., Inc. v. United States*, 913 F.2d 1521 (11th Cir. 1990).  Moreover, in those cases, although the initial order to do the work was given to the general contractor, the owner and the subcontractor developed a relationship over an extended period of time as the work progressed.  In *Stevens*, for example, the owner was in contact almost exclusively with the subcontractor because the general contractor did not have the capability to perform the work.  *Id.* at 1535.  Instead, the owner dealt directly with the subcontractor and its employees directed, inspected, tested, and approved the subcontractor's work on a continuing basis.  *Id.* at 1525–26, 1535.  Thus, the owner's participation with the

18

subcontractor was so substantial that it could not seriously be argued the work was not done on the owner's orders. *Id.*

The *Galehead* panel juxtaposed *Marine Coatings* and *Stevens* with cases involving a one-off transaction, "where the degree of involvement with the owner is minimal or nonexistent." *Galehead*, 183 F.3d at 1246. One of those cases involved fuel provision. *Id.* (citing *Tramp Oil & Marine, Ltd. v. M/V Mermaid I*, 805 F.2d 42, 45 (1st Cir. 1986)). In those circumstances, the subcontractor would not receive a lien. *Id.*

In light of these precedents, the *Galehead* panel determined Asamar did not fall within the exception to the general rule that subcontractors do not receive liens. There was no genuine dispute as to whether Asamar "had the kind of relationship with Genesis that would establish that Genesis authorized Asamar's work on the vessel." 183 F.3d at 1246. Asamar's contact with Genesis was much more limited than the significant and ongoing involvement between the subcontractors and the owners in *Marine Coatings* and *Stevens*.

Radcliff attempts to avail itself of the significant-and-ongoing-involvement exception in this case. The problem for Radcliff is that it does so for the first time on appeal.[13] It offered the district court no occasion to consider the exception, so

---

[13] Radcliff contends that *Galehead* established a five-factor test for significant and ongoing involvement, consisting of the following elements: (1) whether the owner was aware of the subcontractor's performance before and during the performance; (2) the amount of work

19

the trial proceeded without any reference to it.  Rather, Radcliff argued that, even if

*Ken Lucky* did not control the case, the acceptance of the fuel by the Deep Blue's

Chief Engineer constituted "ratification" of a contract between Technip and

Radcliff directly.  *See* Amended Brief in Support of Summary Judgment at 5; Trial

Transcript at 216, 221–223, 245.  This "ratification" argument is markedly

different from *Galehead*'s significant-and-ongoing-involvement test.  Radcliff's

failure to present the district court with the possibility that it fell into the *Galehead*

exception deprived the court of the opportunity to weigh the facts in light of it.

Consequently, the argument is not properly before us.[14]  *Access Now, Inc. v. Sw.*

*Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004) ("This Court has repeatedly

---

performed by the subcontractor; (3) whether the owner inspected the subcontractor's work; (4) whether the owner gave provisional and final acceptance of the subcontractor's work; and (5) whether the work was fully accepted and compensated.  *See Galehead*, 183 F.3d at 1245–46; Brief of Appellant at 18.  While we are not required to address Radcliff's new reading of *Galehead* because it was not raised before the district court, we nonetheless are not persuaded by it.  *Galehead*, rather than enshrining those factors into a legal test, merely listed them as some of the facts present in *Marine Coatings* that were relevant to the disposition of that case.  *Id.* Though analogous facts could be relevant, they are not dispositive:  the touchstone is significant and ongoing involvement.  *See id.* at 1245 ("Where the level of involvement between the owner and the third-party provider was significant and ongoing during the pertinent transaction, the courts have found a triable issue of fact about whether the third-party deserved a lien.").

[14] Radcliff admitted at oral argument that it did not make this argument to the district court, but urged us to consider it nonetheless.  Although we have the discretion to consider an argument that was not presented to the district court, we do so only when "special circumstances" exist.  *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1332 (11th Cir. 2004) (listing five instances when this Court may consider an argument raised for the first time on appeal).  Radcliff does not show how any of those special circumstances are present here; it merely asserts that the record is sufficiently developed for this Court to apply the legal test it submits on appeal.  We disagree and decline to consider the merits of Radcliff's argument.

20

held that an issue not raised in the district court and raised for the first time in an appeal will not be considered by this court." (quotations omitted)); *accord Hurley v. Moore*, 233 F.3d 1295, 1297 (11th Cir. 2000) ("Arguments raised for the first time on appeal are not properly before this Court.").

As a result, the district court did not err in determining Radcliff does not have a lien on the Deep Blue.[15]

## B. Whether ING Has a Lien

As previously stated, whether ING has a lien on the Deep Blue depends first on whether O.W. UK had a lien and second on whether that lien was assigned to ING under the Security Agreement. The district court answered both questions in the affirmative, and we find no error in its determination.

### 1. Whether O.W. UK Had a Lien

There is no dispute that O.W. UK acted "on the order" of Technip, the owner of the Deep Blue, when it agreed to sell 850 metric tons of bunker fuel to Technip for the ship's use. Whether O.W. UK had a lien on the ship comes down to whether it "provided" the fuel within the meaning of the statute. Radcliff contends O.W. UK did not. After all, Radcliff ultimately delivered it.

---

[15] It is unfortunate that Radcliff supplied the fuel and was not paid. But by entering into a contractual relationship exclusively with O.W. USA, Radcliff became O.W. USA's creditor. It is assuredly not the only one. O.W. USA's other creditors are doubtless vying for repayment in bankruptcy court. Rather than pursue its claim there, Radcliff elected to go after Technip for the full amount by asserting a lien on the Deep Blue, even though Technip purchased the fuel from O.W. UK and was contractually obligated to pay O.W. UK for it. It was Radcliff's right to gamble, but its choice should elicit no sympathy.

The last time we considered this question was, once again, in *Galehead*. And under that case, the answer would appear to be straightforward:  O.W. UK clearly "provided" the fuel, by delegating performance to Radcliff, who then delivered it.  Basic contract principles provide that in general, a party meets its obligations under an agreement when the party's delegate renders performance. *See Galehead*, 183 F.3d at 1245 ("A contracts to deliver to B coal of specified kind and quality.  A delegates the performance of this duty to C, who tenders to B coal of the specified kind and quality.  The tender has the effect of a tender by A." (citing Restatement (Second) of Contracts § 318 cmt. a, illus. 2 (1979))).  When we were presented with this question in *Galehead*, on materially identical facts, we held that the general contractor, Polygon, obtained a lien when its subcontractor delivered fuel on its behalf.  *Id.* ("[A]lthough [general contractor] Polygon did not physically supply the bunkers, a party need not be the physical supplier or deliverer to have 'provided' necessaries under the statute.").  We specifically stated that Polygon "provided" the necessaries within the meaning of § 31342(a) when it caused them to be delivered by contract.  *Id.* ("[The agreement between Genesis and Polygon] caused, or provided for, the delivery of the fuel to the vessel. Therefore, Polygon 'provided' necessaries to the vessel under the contract irrespective of how, or by whom, the delivery was carried out.").

22

Nevertheless, Radcliff contends that the general contractor bears an additional obligation not mentioned in *Galehead* before it can receive a lien:  it must pay the subcontractor to whom it delegated performance.  Radcliff acknowledges that no authority directly supports this proposition, but submits that it lies latent in the case law.

Radcliff's argument is meritless.  First and foremost, it finds no support in the text of the statute.  Section 31342(a) merely requires that the would-be lienor "provid[e] necessaries" to the vessel.  It does not forbid the supplier from using a subcontractor to do so, or require that the parties be current on their accounts payable before a lien arises.  We have consistently held that a maritime lien attaches the moment the necessaries are supplied; subsequent administrative matters such as tendering an invoice are irrelevant.  *Dresdner Bank AG v. M/V OLYMPIA VOYAGER*, 465 F.3d 1267, 1276–77 (11th Cir. 2006); *see also Container Applications*, 233 F.3d at 1362 n.1 ("A maritime lien is [a] special property right in a ship given to a creditor by law as security for a debt or claim subsisting from the moment the debt arises." (internal quotation marks and citation omitted)).  Likewise, payment by the general contractor to the subcontracted supplier is immaterial to the general contractor's lien—it arises at the moment the subcontractor renders performance on the general contractor's behalf.

23

Accordingly, the district court did not err in determining that O.W. UK provided the bunkers to the vessel within the meaning of § 31342(a), and as a result that O.W. UK had a lien on the Deep Blue.

*2. Whether O.W. UK Assigned the Lien to ING*

The district court found that O.W. UK assigned its lien on the Deep Blue to ING pursuant to the Security Agreement.  Radcliff contests that determination on appeal.  Here too, we are unpersuaded.

To begin with, we note that maritime liens are assignable.  Robert Force & Kris Markarian, Fed. Judicial Ctr., Admiralty and Maritime Law Second Edition, 2013 WL 6732869 ("Maritime liens are assignable; the assignee ordinarily assumes the rank of the assignor in determining lien priority."); Thomas J. Schoenbaum, 1 Admiralty and Maritime Law § 9-1 (5th ed.) ("A maritime lien may be assigned, and one who advances money for the discharge of a lien occupies the position of an assignee.").  The question, then, is simply whether the Security Agreement in fact assigned O.W. UK's lien on the Deep Blue.  The Security Agreement is, as the parties agree, governed by English law.  Questions of contract interpretation and matters of foreign law are reviewed *de novo*.  *Hegel v. First Liberty Ins. Corp.*, 778 F.3d 1214, 1219 (11th Cir. 2015); *Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1163 n.5 (11th Cir. 2009).

Pursuant to § 2.3(a) of the Security Agreement, O.W. UK assigned all "rights, title and interest in respect of the Supply Receivables." "Supply Receivables" is defined to include the monetary sum Technip owed to O.W. UK for supplying the fuel.[16] Radcliff asserts that any maritime lien that arose in O.W. UK's favor was not a "right[ ], title [or] interest in respect of" Technip's obligation to pay O.W. UK for the fuel. That is, O.W. UK assigned the monetary debt but not the corresponding maritime lien. There is no merit to this contention.

English principles of contract interpretation ring familiar to the American ear. A court "is concerned to identify the intention of the parties by reference to what a reasonable person having all the background knowledge which would have been available to the parties would have understood them to be using the language in the contract to mean." *Arnold v. Britton*, [2015] AC 1619, ¶ 15 (UKSC), https://www.supremecourt.uk/cases/docs/uksc-2013-0193-judgment.pdf (quotation omitted). That intention is discerned by looking to the words of the contract in their "documentary, factual and commercial context," considering, inter alia, "the natural and ordinary meaning of the clause" and "the overall purpose" of the contract. *Id.*

---

[16] "Supply Receivables" means "any amount owing, or to be owed, to a Receivables Chargor under any Supply Contract," which would include the contract to fuel the Deep Blue between O.W. UK and Technip, because O.W. UK is a "Receivables Chargor" under the Agreement and the contract between Technip and O.W. UK was a "Supply Contract."

25

The lien on the Deep Blue is, without a doubt, a "right" or "interest" under the agreement "in respect of"—in other words, "[a]s regards, as relates to; with reference to"[17]—Technip's obligation to pay O.W. UK for the fuel.  Indeed, the whole purpose of the lien is to secure the debt.  *See Galehead*, 183 F.3d at 1247 (noting that a maritime lien is "security for a debt" (citation omitted)).  The debt was assigned; it is only reasonable that the security would be assigned as well.  The documentary, factual, and commercial context confirm that it was the intention of the O.W. Bunker Group and ING to assign the lien to ING.  As ING notes, the Security Agreement was executed in connection with a $700 million credit facility extended to the O.W. entities during their financial hardship.  There is little reason to believe parties intended to exclude the lien, by which the bank could enforce the debts it had acquired to secure the loan to the O.W. Bunker entities.

The district court did not err in determining that O.W. UK had a lien on the Deep Blue and that O.W. UK assigned it to ING.

### IV. CONCLUSION

For the foregoing reasons, the district court did not err in finding that ING has a lien on the Deep Blue and Radcliff does not.  Accordingly, its judgment is **AFFIRMED.**

---

[17] *See In respect of*, Oxford English Dictionary Online, http://www.oed.com/view/Entry/163779?redirectedFrom=in+respect+of#eid177413195 (last visited Nov. 13, 2017).