# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-30194

United States Court of Appeals
Fifth Circuit

**FILED**

June 19, 2018

Lyle W. Cayce
Clerk

VALERO MARKETING & SUPPLY COMPANY,

Plaintiff - Appellant

v.

M/V ALMI SUN, IMO NO. 9579535, her engines, apparel, furniture, equipment, appurtenances, tackle, etc., in rem; VERNA MARINE COMPANY, LIMITED, appearing solely and restrictively as claimant of the M/V Almi Sun,

Defendants – Appellees

Appeal from the United States District Court
for the Eastern District of Louisiana

Before HIGGINBOTHAM, JONES, and HAYNES, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

This case asks whether a bunker supplier, having entered into a contract with a bunker trader that later went bankrupt, is entitled to assert a maritime lien against the vessel that physically received its fuel. Because that supplier cannot show that it provided necessaries "on the order of the owner or a person authorized by the owner," we affirm the district court's denial of a maritime lien.

No. 16-30194

## I.

While in Corpus Christi, Texas, the Almi Sun (the "Vessel") needed refueling. Almi Tankers S.A., an agent for the Vessel's owner Verna Marine Co. Ltd., contracted with O.W. Bunker Malta, Ltd., a fuel trader, to procure bunkers. During negotiations, Almi Tankers requested the name of the physical supplier, and O.W. Malta named Valero Marketing & Supply Company. O.W. Malta issued a final sales order confirming Valero as the supplier and listing itself as the seller. Another O.W. Bunker entity, O.W. Bunker USA, Inc., then contracted with Valero to purchase the fuel. O.W.'s involvement ended there. Valero coordinated delivery directly with the Vessel, and Vessel agents tested and verified the bunkers' quality. After delivery was completed, an authorized officer of the Vessel signed the bunkering certificate, and Valero submitted an invoice to O.W. USA.

In early November 2014, Almi Tankers learned that the O.W. Bunker group of companies faced significant financial problems and might be unable to pay Valero. Almi Tankers requested "written confirmation and evidence of payment," and "reserve[d] the right to make remittance directly to the physical supplier and . . . hold any balance due . . . for payment." O.W. Bunker and other related entities filed for bankruptcy shortly thereafter.

Valero then brought this *in rem* action seeking a maritime lien for the amount owed for the bunkering plus interest and fees. Verna appears as the *in rem* claimant of the Vessel defending the action on the Vessel's behalf. Both Valero and Verna moved for summary judgment, and the district court granted summary judgment in favor of Verna. Valero timely appeals.

No. 16-30194

## II.

We review the "'district court's grant of summary judgment de novo, applying the same standards as the district court.'"[1] Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[2] On summary judgment, we view the evidence in the light most favorable to the nonmovant, and draw all reasonable inferences in the nonmovant's favor.[3]

## III.

The Commercial Instruments and Maritime Liens Act ("CIMLA") governs the circumstances under which a party is entitled to a maritime lien. In relevant part, CIMLA states that a person providing necessaries to a vessel "on the order of the owner or a person authorized by the owner" is entitled to a maritime lien on the vessel.[4] Section 31341(a) lists "persons . . . presumed to have authority to procure necessaries for a vessel:"

> (1) the owner; (2) the master; (3) a person entrusted with the management of the vessel at the port of supply; or (4) an officer or agent appointed by—(a) the owner; (b) a charterer; (c) an owner pro hac vice; or (d) an agreed buyer in possession of the vessel.[5]

We apply the provisions of CIMLA *stricti juris* to ensure that maritime liens are not "lightly extended by construction, analogy, or inference."[6]

It is not unusual for an entity supplying necessaries to a vessel to lack privity of contract with the owner of that vessel, and to instead contract with

---

[1] *Green v. Life Ins. Co. of N. Am.*, 754 F.3d 324, 329 (5th Cir. 2014) (quoting *Cooper v. Hewlett-Packard Co.*, 592 F.3d 645, 651 (5th Cir. 2009)).

[2] FED. R. CIV. P. 56(a).

[3] *Cox v. Wal-Mart Stores East, L.P.*, 755 F.3d 231, 233 (5th Cir. 2014).

[4] 46 U.S.C. § 31342(a).

[5] 46 U.S.C. § 31341(a).

[6] *Atlantic & Gulf Stevedores, Inc. v. M/V GRAND LOYALTY*, 608 F.2d 197, 200–01 (5th Cir. 1979). In *Atlantic & Gulf Stevedores*, we ruled that a vessel's chief officer is a "person to whom management of the vessel at the port of supply is intrusted" for purposes of section 972 of the Federal Maritime Lien Act—the predecessor to CIMLA. *Id.* at 200–03. In so

3

No. 16-30194

an intermediary. In *Lake Charles*, we recognized two lines of cases that deal with such circumstances: the general/subcontractor line of cases and the principal/agent, or "middle-man," line of cases.[7] To determine which line of cases applies, *Lake Charles* instructs that "it is not whether an intermediary can be expected to supply the necessaries itself that distinguishes instances in which the actual suppliers have liens, but it is rather the nature of the relationship between each pair of entities that are involved in the transaction at issue."[8]

As it happened in *Lake Charles*, ED&F Man Sugar, Inc. entered into an agreement to purchase rice from Broussard Rice Mill, Inc. In that agreement, the parties assigned the responsibility of providing stevedoring services to Broussard. Broussard, working through an agent, awarded Lake Charles Stevedores ("LCS") the bid to load the rice onto the vessel. LCS loaded the rice, and the vessel's agents signed activity sheets and receipts. When Broussard failed to pay, LCS asserted a maritime lien for its services.[9]

---

holding, we acknowledged the doctrine of *stricti juris* but opined that the Federal Maritime Lien Act "is not to be viewed through the constricting glass of [s]tricti juris" as its "legislative history" required "a more liberal application than that which existed prior to the 1971 amendments to the Maritime Lien Act." *Id.* at 201. We further explained that Congress intended to "make it easier and more certain for stevedores and others to protect their interests by making maritime liens available where traditional services are routinely rendered." *Id.*

In subsequent decisions, however, we have clarified our "respect for the principle of *stricti juris*," counseling against application of the sweeping language set forth in *Atlantic & Gulf Stevedores* to the present case. *See Lake Charles Stevedores, Inc. v. PROFESSOR VLADIMIR POPOV MV*, 199 F.3d 220, 231 (5th Cir. 1999). As we discuss *infra*, *Lake Charles* stands for the rule in our circuit that a subcontractor is generally not entitled to assert a maritime lien "unless it can be shown that an entity authorized to bind the ship controlled the selection of the subcontractor and/or its performance." *Id.* at 229. Because *Lake Charles* is on point, we are guided by its application of *stricti juris* here.

[7] *Id.* at 228–29.

[8] *Id.* at 230.

[9] *Id.* at 222–23.

4

We found those facts to be "more akin to those in which general contractors have been engaged to supply a service and have called upon other firms to assist them in meeting their contractual obligations."[10] Typically, "the general contractor supplying necessaries on the order of an entity with authority to bind the vessel has a maritime lien"; however, "subcontractors hired by those general contractors are generally not entitled to assert a lien on their own behalf, unless it can be shown that an entity authorized to bind the ship controlled the selection of the subcontractor and/or its performance."[11] Because Man Sugar "retained no control over the selection of a stevedoring concern, and Broussard accepted all the risk associated," we held that LCS was not entitled to a maritime lien.[12]

*Ken Lucky* typifies the middle-man line of cases.[13] In that case, the following sequence of events occurred: Bulkferts, Inc., the vessel's subcharterer, placed an order for fuel with its managing agent, Eurostem Maritime Limited; Eurostem contacted Brook Oil Ltd., a fuel trader; Brook Oil then instructed Gray Bunkering Services to place an order for fuel with Marine Fuel, the physical supplier; Marine Fuel, in turn, asked Gray for assurances about payment before delivery of the bunkers; Gray notified Marine Fuel that it had been "nominated by the owner" of the vessel to supply the fuel; Marine Fuel delivered the fuel; and the vessel's chief engineer accepted the fuel with the approval of the vessel's master.[14] After having unsuccessfully sought payment, Marine Fuel asserted a maritime lien on the vessel.[15]

---

[10] *Id.* at 230.

[11] *Id.* at 229.

[12] *Id.* at 230.

[13] *Marine Fuel Supply & Towing, Inc. v. M/V KEN LUCKY*, 869 F.2d 473 (9th Cir. 1988).

[14] *Id.* at 475.

[15] *Id.*

No. 16-30194

The Ninth Circuit found that Marine Fuel was entitled to a lien because the parties agreed that the order originated from Bulkferts, the subcharterer, an entity with authority to bind the ship.[16] Due to that concession, the Ninth Circuit did not "reach . . . the district court's conclusion that Brook was *not* Bulkfert's agent," concluding that Marine Fuel did not need to "establish agency between Brook and Bulkferts to fall within the scope of one entitled to a maritime lien under [CIMLA]."[17]

IV.

In this case, there is no dispute that bunkers qualify as necessaries and that Valero provided those necessaries to the Vessel. The sole inquiry before us is whether Valero furnished the necessaries to the Vessel "on the order of the owner or a person authorized by the owner." We conclude that it did not.

The record shows that Verna, through its agent Almi Tankers, contacted OW Malta because it was a "reputable bunker trader[]";that during negotiations, Almi Tankers asked who would be the bunker fuel supplier, and it did not object to Valero's selection; that the sales order confirmation listed Valero as the supplier; that Valero provided the entire bunkering service that Almi Tankers contracted for, with no assistance from O.W. or its affiliates; that the Vessel's agents monitored and tested Valero's performance; and that Almi Tankers expressed concern about O.W.'s ability to pay Valero.

These facts do not demonstrate that Valero provided the bunkers to the Vessel "on the order of the owner or a person authorized by the owner." Valero provided the bunkers at O.W.'s request, and O.W. is not a "person [] presumed

---

[16] *Id.* at 477.

[17] *Id.* The Ninth Circuit separately examined the master's implied authority to incur a lien against the vessel upon accepting the supplies that Marine Fuel delivered, and determined that the master had such authority because a ship's master has *presumed* authority to incur a lien under CIMLA. *Id.* at 477–78.

to have authority to procure necessaries[.]"[18] These facts are "more akin to those in which general contractors have been engaged to supply a service and have called upon other firms to assist them in meeting their contractual obligations."[19] Thus, Valero must show that an entity authorized to bind the ship "controlled [its] selection . . . and/or its performance."[20] The record, however, proves no more than the Vessel's awareness of Valero, not that the Vessel "controlled" the selection or performance of Valero. Mere awareness does not constitute authorization under CIMLA.[21]

Despite Valero's urging, we decline to apply *Ken Lucky*. As mentioned *supra*, the Ninth Circuit's holding—that the physical supplier could assert a lien—turns on the parties' concession that the physical supplier sold the bunkers to an entity with authority to bind the vessel.[22] Here, Valero dealt with O.W., not with Verna or Almi Tankers, and the record does not establish that O.W. served as Verna's or Almi Tankers' agent.[23] Thus, *Ken Lucky* is inapplicable.

---

[18] 46 U.S.C. § 31341(a); *see also ING Bank N.V. v. M/V TEMARA*, No. 16-4019, 2018 WL 2944306, -- F.3d -- , at *6 (2d Cir. June 13, 2018) (finding that physical supplier was not entitled to a maritime lien when it provided necessaries at the direction of an O.W. Bunker entity acting as an intermediary "rather than at the direction of the owner or the charterer of the Vessel, or any other statutorily-authorized person"); *Barcliff, LLC v. M/V DEEP BLUE*, 876 F.3d 1063, 1071 (11th Cir. 2017) (same); *Galehead, Inc. v. M/V ANGLIA*, 183 F.3d 1242, 1245 (11th Cir. 1999) (finding that supplier provided the bunkers at the trader's request, and that the trader is not a "person [] . . . presumed to have authority to procure necessaries"); *Port of Portland v. M/V PARALLA*, 892 F.2d 825, 828 (9th Cir. 1989) (denying maritime lien when supplier dealt with general contractor, not vessel owner or vessel owner's agent).

[19] *Lake Charles*, 199 F.3d at 230.

[20] *Id.* at 229.

[21] *Id.* at 232 (explaining that CIMLA's authority requirement would be rendered meaningless if "awareness that necessaries are being supplied was sufficient, even though those necessaries were procured by an entity without authority to bind the vessel").

[22] *Ken Lucky*, 869 F.2d at 477.

[23] *Id.*

V.

The dissent says that we fail to follow *Lake Charles* because in that case, "we made clear that the 'subcontractor' line of cases is itself divided into two lines of cases: (1) cases requiring 'an entity with authority to bind the vessel' to '*direct* that the general contractor hire a particular subcontractor in order for that subcontractor to be entitled to a lien'; and (2) cases requiring the subcontractor to be 'identified and accepted by the vessel's owner or charterer prior to performance.'" The dissent's view likely emerges from the following passage in *Lake Charles*:

> In keeping with the notion that subcontractors may acquire liens where the vessel's owners retain control over their selection and/or performance, the Ninth and Second Circuits require that an entity with authority to bind the vessel direct that the general contractor hire a particular subcontractor in order for that subcontractor to be entitled to a lien. *See Port of Portland,* 892 F.2d at 828; *Farwest,* 828 F.2d at 526; *Integral Control Sys.*, 990 F. Supp. at 301. In other cases in which subcontractors have been found to be entitled to a lien, those subcontractors were identified and accepted by the vessel's owner or charterer prior to performance. *See Stevens,* 913 F.2d at 1525, 1534; *Turecamo of Savannah, Inc. v. United States,* 824 F. Supp. 1069, 1072 (S.D. Ga. 1993). Owner involvement in directing, testing, and/or inspecting subcontractor performance has also been cited in support of finding a lien in favor of a subcontractor. *See Stevens*, 913 F.2d at 1535; *cf. Marine Coatings*, 932 F.2d at 1375 n.9 (listing operator's inspecting subcontractor work and giving provisional and final acceptance to work performed by the subcontractor among evidence that supported court's conclusion that a genuine issue of fact existed regarding general contractor's authority to bind the vessel). Based on these cases, we agree with the district court that LCS has not shown it was entitled to a lien under the circumstances presented here.[24]

We do not read *Lake Charles* as the dissent does. To these eyes, the above specifies three factual scenarios that color the general proposition that a

---

[24] *Lake Charles*, 199 F.3d at 231 (footnote omitted).

subcontractor is not entitled to a lien, "unless it can be shown that an entity authorized to bind the ship controlled the selection of the subcontractor and/or its performance."[25]  We see no adoption, let alone a clear one, of "two lines of cases" branching from the subcontractor line of cases.

Even assuming that *Lake Charles* divided the subcontractor line of cases into "two lines of cases" *sub silentio*, Valero cannot establish that it falls in either one. Verna, through Almi Tankers, neither "direct[ed] that the general contractor hire a particular subcontractor" nor "identified and accepted" Valero "prior to performance." The record merely shows that Verna, through Almi Tankers, was aware that Valero would physically supply the bunkers.

The dissent also says that the majority opinion "creates an unnecessary circuit split with the Eleventh Circuit," citing *Galehead* and likening this case to *Marine Coatings* and *Stevens*.[26] Specifically, the dissent states that *Marine Coatings* and *Stevens* reflect the Eleventh Circuit's embrace of the "second line of cases" of the subcontractor line of cases—*i.e.*, cases requiring the subcontractor to be identified and accepted by the vessel's owner or charterer prior to performance. The dissent, however, overlooks *Barcliff*, in which the Eleventh Circuit held that a subcontractor in the same contractual scenario as here was not entitled to a maritime lien.[27] In so holding, the Eleventh Circuit reviewed *Galehead*, *Marine Coatings*, and *Stevens*.[28] In determining the law of the Eleventh Circuit, we prefer its own statement of its law.

To begin, a review of the facts and holding in *Barcliff* dispel any notion that we create a circuit split.[29] Technip UK Limited, the vessel owner, sent a

---

[25] *Id.* at 229.
[26] *See Marine Coatings of Ala., Inc. v. United States*, 932 F.2d 1370 (11th Cir. 1991); *Stevens Tech. Servs., Inc. v. United States*, 913 F.2d 1521 (11th Cir. 1990).
[27] *Barcliff*, 876 F.3d at 1071–73.
[28] *Id.*
[29] *Id.* at 1065–67; 1071–73.

request to O.W. Bunkers (UK) Limited and two other suppliers seeking bunker fuel. Technip awarded the contract to O.W. UK. Thereafter, O.W. UK entered into a contract with O.W. Bunker USA, Inc., who then contracted with Radcliff, the physical supplier of the bunkers. Like the present case, Radcliff coordinated delivery with the vessel, and upon delivery, the vessel's chief engineer signed a delivery certificate. After O.W. filed for bankruptcy, Radcliff, having gone unpaid and thus finding itself in the same situation as Valero, asserted a maritime lien against the vessel. The Eleventh Circuit ruled that Radcliff was not entitled to a lien because "Radcliff acted on the order of O.W. USA, not Technip."[30]

To reach that holding, the *Barcliff* court reviewed its jurisprudence on maritime liens. It began with the circuit's general rule, as set forth in *Galehead*, which provides: "Where the owner directs a general contractor to provide necessaries to its vessel, a subcontractor retained by the general contractor to perform the work or provide the supplies is generally not entitled to a maritime lien."[31] The *Barcliff* court then noted that *Galehead* recognizes an exception to the general rule. That is, "where the general contractor is not an agent of the owner, and the owner does not initially order the subcontractor to perform the work, it might still be said that the owner 'somehow authorized'

---

[30] *Id.* at 1071.

[31] *Id.* In *Galehead*, Genesis Container Line, a charterer, contacted Polygon Energy Services, Inc. to obtain fuel bunkers for its vessel, and Polygon contacted Establissment Asamar, Ltd. to supply the fuel. Asamar then engaged the physical supplier. This arrangement occurred twice, and Genesis failed to pay Asamar both times. Asamar thereafter assigned its rights to a collection agency, Galehead, who brought suit. 183 F.3d at 1244. The Eleventh Circuit ruled that Galehead was not entitled to a lien, reasoning that "Asamar did not provide the bunkers on order of the owner or an authorized agent." *Id.* at 1245. Rather, the Eleventh Circuit determined that "Asamar provided the bunkers at Polygon's request, and Polygon is not a '"person [] . . . presumed to have authority to procure necessaries[.]'" *Id.* (quoting 46 U.S.C. § 31341(a)).

10

the work if it 'was sufficiently aware of, and involved in, [the] work that it might be said that [the subcontractor] was working for [the owner].'"[32]

This "significant-and-ongoing-involvement exception" emerged from *Marine Coatings* and *Stevens*. The *Barcliff* court proceeded to review these cases, explaining that *Marine Coatings* "involved extensive maintenance, such as painting, coating, and cleaning" and that *Stevens* involved "repair work."[33] In addition, those cases, the *Barcliff* court observed, involved an owner and a subcontractor that "developed a relationship over an extended period of time as the work progressed."[34] The *Barcliff* court then turned specifically to *Stevens*, noting that "the owner was in contact almost exclusively with the subcontractor because the general contractor did not have the capability to perform the work," and "the owner dealt directly with the subcontractor and its employees directed, inspected, tested, and approved the subcontractor's work on a continuing basis."[35] In short, "the owner's participation with the subcontractor was so substantial that it could not seriously be argued the work was not done on the owner's orders."[36] The *Barcliff* court concluded by acknowledging that "[t]he *Galehead* panel juxtaposed *Marine Coatings* and *Stevens* with cases involving a one-off transaction, 'where the degree of involvement with the owner is minimal or non-existent;'"[37] and that "[o]ne of those cases involved fuel provision."[38]

Against this background, *Marine Coatings* and *Stevens* are inapplicable in light of *Barcliff* and *Galehead*. Though *Barcliff* determined that the physical supplier had waived its argument concerning the *Galehead* exception, no

---

[32] 876 F.3d at 1071 (quoting *Galehead*, 183 F.3d at 1245).

[33] *Id.* at 1072.

[34] *Id.*

[35] *Id.* (citing *Stevens*, 913 F.2d at 1525–26, 1535).

[36] *Id.* (citing *Stevens*, 913 F.2d at 1525–26, 1535).

[37] *Id.* (quoting *Galehead*, 183 F.3d at 1246).

[38] *Id.*

11

No. 16-30194

circuit split results by following the holding in *Barcliff*. We are unaware of a case in the Eleventh Circuit, and the dissent proffers none, that applies *Marine Coatings* and *Stevens* to find that a subcontractor may acquire a lien for a one-off transaction in which the vessel owner was merely aware of the subcontractor's identity.[39] The circuits to have addressed the sequence of contracts before us agree that such physical suppliers are not entitled to a maritime lien.[40]

## VI.

We affirm the district court's grant of summary judgment for Verna.

---

[39] *See Galehead*, 183 F.3d at 1246 ("That a charterer of a vessel becomes aware that some work performed was by a party somewhere down the chain of contracting and re-contracting does not give rise to a maritime lien.").

[40] *See ING Bank*, 2018 WL 2944306, at *6–8; *Barcliff*, 876 F.3d at 1071–73.

No. 16-30194

HAYNES, Circuit Judge, dissenting:

The majority opinion fails to follow our prior precedent in *Lake Charles Stevedores, Inc. v. Professor Vladimir Popov MV*, 199 F.3d 220, 231 (5th Cir. 1999) and creates an unnecessary circuit split with the Eleventh Circuit. *See Galehead, Inc. v. M/V Anglia*, 183 F.3d 1242, 1245–46 (11th Cir. 1999) (per curiam); s*ee also Noramco Shipping Corp. v. Bunkers Int'l Corp.*, No. 6:02CV515-ORL-22DAB, 2003 WL 22594419, at *7 (M.D. Fla. Apr. 30, 2003) ("Under Eleventh Circuit jurisprudence, the right of a subcontractor to assert a maritime lien against a vessel for necessaries is not restricted by a rigid rule but instead depends on the degree of involvement between the owner and the subcontractor."). Accordingly, I respectfully dissent.

I agree that Valero is a subcontractor under the "general contractor/subcontractor" line of cases. *Lake Charles* explains the general proposition that "subcontractors hired by those general contractors are generally not entitled to assert a lien on their own behalf, unless it can be shown that an entity authorized to bind the ship controlled the selection of the subcontractor and/or its performance." 199 F.3d at 229. However, this exception is not as narrow as the majority opinion makes it seem. Unmentioned by the majority opinion, in *Lake Charles* we made clear that the "subcontractor" line of cases is itself divided into two lines of cases: (1) cases requiring "an entity with authority to bind the vessel" to "*direct* that the general contractor hire a particular subcontractor in order for that subcontractor to be entitled to a lien"; and (2) cases requiring the subcontractor to be "identified and accepted by the vessel's owner or charterer prior to performance." *Id.* at 231. In the second line of cases, "[o]wner involvement in directing, testing, and/or inspecting subcontractor performance has also been

13

cited in support of finding a lien in favor of a subcontractor."[1]  *Id.*  We clearly adopted both lines of cases but found that the subcontractor in *Lake* Charles did not meet either one.  *See id.*

The Eleventh Circuit has embraced the second line of cases.  In *Marine Coatings of Alabama v. United States*, the Eleventh Circuit addressed the question of the availability of a subcontractor lien in a repair services contract. 932 F.2d 1370, 1375–76 (11th Cir. 1991).  There, the United States Navy entered into Master Ship Repair Contracts with Braswell Shipyards, Inc., that permitted Braswell to hire subcontractors, although "the contracts did not purport to make Braswell an agent of the government."  *Id.* at 1732.  Braswell subcontracted with Marine Coatings of Alabama, Inc. ("MCI"), for the painting, cleaning, and coating of three vessels, and the United States inspected and approved MCI's work.  *Id.* at 1373.  The United States paid Braswell, but Braswell filed for Chapter 11 without paying MCI.  *Id.*  Despite being a subcontractor, MCI asserted a maritime lien against the three vessels, and the Eleventh Circuit found "a genuine issue as to whether the government procured MCI's work, authorized the work, or ratified the procurement of MCI's work.  Alternatively, there is a genuine issue as to whether Braswell was authorized by the government to procure MCI's work." *Id.* at 1376.

Likewise, in *Stevens Technical Services., Inc. v. United States*, the Sealift Antarctic needed a "major overhaul."  913 F.2d 1521, 1525 (11th Cir. 1990).

---

[1] *Compare Galehead*, 183 F.3d at 1245 ("Where the level of involvement between the owner and the third-party provider was significant and ongoing during the pertinent transaction, the courts have found a triable issue of fact about whether the third-party deserved a lien."), *with Cianbro Corp. v. George H. Dean, Inc.*, 596 F.3d 10, 17–18 (1st Cir. 2010) (holding that subcontractor was not entitled to a lien where "the record establishes that [the vessel's owners] did not have any participation in the subcontracting of this work or control over its performance"), *and Bonanni Ship Supply, Inc. v. United States*, 959 F.2d 1558, 1565 (11th Cir. 1992) ("[T]he mere fact of acceptance and full compensation to the prime contractor, absent any allegation that the [vessel's owner] had any knowledge of *performance by the subcontractor plaintiff*, is insufficient to create a genuine issue of material fact regarding whether the plaintiff was a maritime lienor under the MCILA.").

Marine Transport Lines, Inc. ("MTL"), on behalf of the United States government, solicited bids, and Atlantic submitted a bid that identified Stevens as a subcontractor. *Id.* Atlantic then entered into a memorandum of understanding with Stevens, dividing the work between the two of them. *Id.* Subsequently, Atlantic's bid was accepted and MTL awarded it the contract. *Id.* During the course of the work, government representatives inspected, tested, and approved the work performed by both Atlantic and Stevens. *Id.* at 1525–26. Once work was completed, MTL paid Atlantic, but Atlantic failed to pay Stevens. *Id.* at 1526. Stevens subsequently filed actions against Atlantic *in personam* and against the Sealift Antarctic *in rem*. *Id.* In vacating and remanding for further reconsideration, the Eleventh Circuit pointed to several factors that might have indicated Stevens was entitled to a maritime lien: (1) that the government's representatives were aware of Steven's performance and the principal contract showed Stevens as a subcontractor having more than 15 percent of the contract's value; (2) that the government's representatives knew that Atlantic was not capable of full performance on its own; (3) that the contract covering the work was fully authorized by the government's representatives; (4) that the government's representatives worked directly with Stephens in discussing, testing, and inspecting Stephen's work; and (5) that all of the work was accepted and fully compensated to Atlantic. *Id.* at 1534–35.

Here, the majority opinion significantly understates Almi's involvement in the bunkering transaction when it describes it as a "one-off transaction in which the vessel owner was merely aware of the subcontractor's identity." To the contrary, the parallels to *Stevens,* in light of the standards adopted in *Lake Charles,* are clear: (1) during negotiations with O.W., Almi made a point to discover who would perform the bunkering; it did not object to Valero's selection and thus impliedly approved Valero prior to finalizing the bunkering

agreement; (2) Almi knew that O.W., as a "reputable bunker trader," could not bunker the vessel itself but would purchase bunkers from a physical supplier; (3) the contract with O.W., which designated Valero as the supplier, was fully authorized by a party with authority to bind the vessel; (4) the vessel's agents engaged directly with Valero and tested and approved of Valero's bunkers; and (5) the vessel's agents approved of the bunkers and signed a certificate confirming performance.

The majority opinion's reliance on *Barcliff, LLC v. M/V DEEP BLUE, IMO No. 9215359* is misplaced. *See* 876 F.3d 1063, 1071–73 (11th Cir. 2017). As an initial matter, *Barcliff* determined that the central issue here was not properly before it, thus the commentary relied on by the majority opinion is mere dicta. *See id.* at 1073. Even if it were not dicta, *Barcliff* does not mandate the result reached by the majority opinion. As already shown, similar to *Stevens,* Almi "was sufficiently aware of, and involved in, [Valero's services] that it might be said that [Valero] was working for [it]." *See id.* at 1071 (quoting *Galehead*, 183 F.3d at 1245). Moreover, *Barcliff* does not exclude one-off bunkering services that satisfy this rule. *Barcliff* indicated that the exception has not been applied where the owner's involvement was "minimal or non-existent," and then it observed that "[o]ne of those cases involved fuel provision." *Id.* at 1072 (citing *Tramp Oil & Marine, Ltd. v. M/V Mermaid I*, 805 F.2d 42, 45 (1st Cir. 1986)). In *Tramp Oil*, however, no relationship existed between the vessel's owner and the fuel broker seeking the lien, and the vessel's owner did not know about the fuel broker (who was retained by an intermediary) until after its work was completed. *See Tramp Oil*, 805 F.2d at 45 ("In this case, however, no relationship existed between Tramp and the vessel, and neither the vessel owner nor the charterer even knew of Tramp until after Tramp had made the payment to Exxon.").

16

Although a subcontractor, the interactions between the vessel and Valero are such that Valero is entitled to assert a maritime lien. That O.W. was expected to pay Valero is not the point; "[e]xpectations that payment for the services would be made by some party other than the vessel does not vitiate a lien by one who, as permitted under [the Act], is not required to prove reliance on the credit of the vessel."[2] *Stevens*, 913 F.2d at 1536.

For these reasons, I conclude Valero is entitled to relief. From the majority opinion's decision to the contrary, I therefore respectfully dissent.

---

[2] Verna argued in its brief and at oral argument that it has already paid OW Malta for the fuel in order to settle a contractual arbitration dispute in the United Kingdom; that this decision will result in Verna being forced to pay twice for the same fuel. That reality is one of Verna's own making—an attempt to extinguish O.W.'s claims while this action was pending. I note that Almi Tankers expressed concern to O.W. regarding the conglomerate's financial situation and reserved the right to pay Valero directly, ultimately deciding to pay O.W. Verna's unilateral decision does not control the outcome here.