MARINE FUEL SUPPLY & TOWING, INC., a foreign corporation, Plaintiff–Appellant,

v.

The M/V KEN LUCKY, and her appurtenances, Defendant–Appellee.

No. 87–3841.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 10, 1988.

Decided Oct. 25, 1988.

**1406**

Gordon T. Carey, Jr., Portland, Or., for plaintiff-appellant.

Kim Jefferies, Wood, Tatum, Mosser, Brooke & Landis, Portland, Or., for defendant-appellee.

Before HUG, FLETCHER and NELSON, Circuit Judges.

NELSON, Circuit Judge:

Marine Fuel Supply & Towing, Inc. ("Marine Fuel") appeals the district court's refusal to grant Marine Fuel a maritime lien on the M/V KEN LUCKY ("Ken Lucky") pursuant to 46 U.S.C.App. §§ 971–75 (1982). The district court exercised jurisdiction pursuant to 28 U.S.C. § 1333 and we have jurisdiction pursuant to 28 U.S.C. § 1291. We reverse and remand.

## BACKGROUND

Ken Hieng Navigation Company S.A. ("Ken Hieng") owns the Ken Lucky. During the time Marine Fuel alleges the lien arose, Ken Hieng had time chartered the vessel to Compaigne Continental Paris ("Continental Grain"). A time charter entails a division of responsibilities between the owner and charterer. *Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co.*, 310 U.S. 268, 278, 60 S.Ct. 937, 942, 84 L.Ed. 1197 (1940) (*"Signal Oil"*). Continental Grain in turn subchartered the vessel to Bulkferts, Inc. ("Bulkferts"). Both charter agreements contained "no lien" clauses, which prohibited maritime liens asserted by suppliers against the vessel.

When the Ken Lucky reached Tampa, Florida, in September 1984, it needed bunker fuel. To arrange for the supplies, Bulkferts' managing agent, Eurostem Maritime Limited ("Eurostem"), contacted Brook Oil Ltd. ("Brook"). Brook then instructed Gray Bunkering Services ("Gray") to place the order for the Ken Lucky's supplies with Marine Fuel. Marine Fuel asked Gray for assurances about payment before delivery of the bunkers. In response, Gray sent a telex on September 3, 1984 notifying Marine Fuel that it had been "nominated by the owner" of the Ken Lucky to supply the vessel. Ken Lucky's local (husbanding) agent arranged for delivery of the supplies. On September 6, 1984, Marine Fuel supplied the Ken Lucky with bunkers worth $223,480.10. The master of the Ken Lucky, appointed by the owner, approved the acceptance of the supplies by the vessel's chief engineer. Marine Fuel billed Gray for the bunkers, referencing Brook's account. Marine Fuel unsuccessfully sought payment from Brook, which was forced into receivership in October of 1984.

Marine Fuel arrested the Ken Lucky in Portland, Oregon. Ken Lucky posted cash as security for Marine Fuel's claim, which counsel for the parties deposited in a Portland bank. The district court refused to grant Marine Fuel a maritime lien.[1] The

---

1. We summarize the district court's factual findings. Mohamed Sipra, owner of Brook and Bulkferts, had set up a vertically integrated shipping system composed of the several separate and distinct corporations to transport goods and to service ships. Bulkferts chartered vessels but its expenses were paid by its managing agent, Eurostem. Eurostem employed the workers for the other Sipra companies. Bulkferts had no employees. Trans Gulf Lines, Inc. received and carried freight. Brook was created in 1983 to service Sipra vessels. Sipra financed Brook.

Brook was the exclusive supplier for Sipra's ships and all of Brook's business was done with Sipra at the time Marine Fuel supplied the Ken Lucky. Eurostem, Bulkferts' managing agent, usually requested the supplies for the vessels chartered by Bulkferts from Brook and paid Brook for the supplies.

The district court examined the relationship between Bulkferts and Brook. The court found that although Brook and Bulkferts both were owned by Mohamed Sipra, the companies dealt only at arms-length. Gerald Dowden, who

cross appeal has been dismissed. Marine Fuel timely appealed.

## STANDARD OF REVIEW

We review the district court's findings of fact under the clearly erroneous standard, including the predominantly factual inquiry of whether a person was authorized by the owner to order the supplies. *Farwest Steel Corp. v. Barge Sea–Span*, 769 F.2d 620, 623 (9th Cir.1985) (*"Farwest I"*). However, we review the district court's statutory construction de novo, *Mobil Sales & Supply Corp. v. Panamax Venus*, 804 F.2d 541, 542 (9th Cir.1986), and retain power to correct any legal misunderstandings of the district court. *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1044–45 (5th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 286, 98 L.Ed.2d 246 (1987).

## DISCUSSION

### I. AUTHORIZATION OF THE SUPPLY ORDER

Marine Fuel contends that Brook, the bunker broker, had presumed authority under the Federal Maritime Lien Act (the Act) [2] from Bulkferts and Eurostem, the subcharterer and its managing agent, to incur a lien on behalf of the Ken Lucky. The district court found that because no agency relationship existed between Bulkferts and Brook, no presumed authority under the Act was established. Marine Fuel contends that Brook had implied au-

thority from Bulkferts or the ship's owner to incur the lien. Alternatively, Marine Fuel argues that Bulkferts, as a person authorized under section 971 or 972 had presumed authority under the Act to order fuel and to incur a lien against the vessel. The district court concluded that the charter agreements' no lien clauses prevented Brook from acting pursuant to implied authority to incur a lien.

■ Appellant argues that the defendants' admission that it sold marine fuel and bunkers to Bulkferts should be admitted and considered by this court. We agree. No motion or ruling concerning withdrawal of an admission was made by appellees. *Cf. 999 v. C.I.T. Corp.*, 776 F.2d 866 (9th Cir.1985) (district court did not abuse its discretion in denying motion to withdraw admission). Thus, the fact is deemed admitted and conclusively established pursuant to Fed.R.Civ.P. 36(b). The district court did not exercise its discretion to permit withdrawal under Fed.R.Civ.P. 36(b); therefore, the admission must stand.

### A. *The Federal Maritime Lien Act*

■ "The federal Maritime Lien Act grants a maritime lien to any person 1) furnishing repairs, supplies, or other necessaries 2) to any vessel 3) 'upon the order of the owner of such vessel, or of a person authorized by the owner.'" *Farwest I*, 769 F.2d at 623 (quoting 46 U.S.C.App. § 971). The parties agree that Marine Fuel fur-

managed Brook, controlled its daily operations. Although the offices of Brook were in the same building as the other Sipra companies, the Brook offices were on a separate floor. Brook kept separate financial records from the other Sipra companies and a separate account at Sipra's bank, the Johnson–Matthey Bank of London ("the bank"), although the debts of all of Sipra's companies were cross-guaranteed at the bank. The court found that Brook had no authority, presumed or implied, to subject the Ken Lucky to a lien. The court found that Brook acted independently of Bulkferts in supplying the vessel.

**2.** The Act provides:

§ 971. Persons entitled to lien. Any person furnishing ... necessaries, to any vessel.... upon the order of the owner of such vessel, or of a *person authorized by the owner,* shall have a

maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel.

§ 972. Persons authorized to procure repairs, supplies, and necessaries. The following persons shall be *presumed* to have authority from the owner to procure ... necessaries for the vessel: The managing owner, ship's husband, master, or any person to whom the management of the vessel at the port of supply is intrusted....

§ 973. Notice to person furnishing repairs, supplies, and necessaries. The officers and agents of a vessel specified in section 972 of this title shall be taken to include such officers and agents when appointed by a charterer, by an owner pro hac vice, or by an agreed purchaser in possession of the vessel. 46 U.S.C.App. §§ 971–73 (1982) (emphases added).

nished necessaries to the Ken Lucky. Ken Lucky admits that Bulkferts was in possession and control of the vessel during the time it docked in Tampa. Thus, Bulkferts qualifies as an authorized person under Section 972 because it was the "person to whom the management of the vessel at the port of supply [was] intrusted." [3]

The district court based its refusal to find an agency relationship between Bulkferts and Brook on two propositions: 1) that Brook was an independent corporation; and 2) that Brook was a back-to-back trader. Marine Fuel argues that Brook can be an independent corporation and still have acted as Bulkferts' agent in the disputed transaction. *See Protective Ins. Co. v. Coleman*, 144 Ill.App.3d 682, 98 Ill.Dec. 914, 924, 494 N.E.2d 1241, 1250 (1986); Restatement (Second) Agency § 14 (1958). We look to principles of agency to interpret the Act's references to agents. *Cactus Pipe & Supply Co. v. M/V Montmartre*, 756 F.2d 1103, 1111 (5th Cir.1985). We examine the roles of the parties in the transactions at issue to determine if a person has presumed authority under the Act. *See, e.g., Farwest I*, 769 F.2d 623–24; *Farwest Steel Corp. v. Barge Sea-Span*, 828 F.2d 522, 525–26 (9th Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 1594, 99 L.Ed.2d 909 (1988) ("*Farwest II*").

■ The parties agree that the order originated from Bulkferts. Thus, we need not reach the question whether the district court's conclusion that Brook was not Bulkfert's agent is erroneous because appellees have already admitted that the fuel and bunkers were sold *to Bulkferts*. We conclude that Marine Fuel need not establish agency between Brook and Bulkferts to fall within the scope of one entitled to a maritime lien under the Act.

Ken Lucky concedes that Bulkferts was authorized to bind the vessel. It is clear that Eurostem, as managing agent for Bulkferts, did order the fuel and it is also clear that Marine Fuel delivered the fuel *to the vessel*. Section 971 states that any person furnishing supplies or other necessaries *to a vessel* "upon" the order of a person authorized to bind the vessel shall be entitled to lien. It is clear that Eurostem, as managing agent for Bulkferts, ordered the fuel, and it is also clear that Marine Fuel delivered the fuel *to the vessel*. Bulkferts had statutory authority to order the fuel under section 972 and it did so. Marine Fuel delivered the fuel to the vessel after Bulkferts ordered it. Thus, this case can be easily distinguished from the situation present in *Farwest II.*

In *Farwest II*, we affirmed the district court's finding that the general contractor did not qualify as an "authorized person" to bind the vessel under § 972. *Id.* at 525–26. We distinguished between the general contractor's responsibility for vessel repairs and one who has broad management powers to qualify as a person "intrusted" with management of the vessel under § 972, relying on a line of cases in which courts "have uniformly held that the general repair contractor was not endowed with sufficient 'management' authority to support a section 971 lien." *Id.* at 526. However, no restrictive repair contract line of cases governs the issue here. Further, no specific instruction was given in *Farwest*, as Bulkferts gave here, authorizing Eurostem to order the bunkers through Brook.

In *Farwest*, the steel was ordered by a contractor repairing the vessel. No one with authority to lien the vessel originated the order. Here Bulkferts, which clearly possessed the statutory authority to bind the vessel, ordered and received the bunkers and fuel. Thus, we are not confronted with a *Farwest II* situation, where a person who never had authority originated the order.

---

3. Ken Lucky does not contest that Bulkferts, the subcharterer, is treated as a charterer for purposes of the Act. A charterer is authorized by law to bind the vessel. *The ASTORIAN*, 57 F.2d 85, 89–90 (9th Cir.1932); *The Golden Gate*, 52 F.2d 397, 399 (9th Cir.1931), *cert. denied*, 284 U.S. 682, 52 S.Ct. 199, 76 L.Ed. 576 (1932). A time charterer is presumed to have the authority to bind the vessel under the Act. *Foss Launch & Tug Co. v. Char Ching Shipping U.S.A., Ltd.*, 808 F.2d 697, 700 (9th Cir.), *cert. denied*, — U.S. —, 108 S.Ct. 96, 98 L.Ed.2d 57 (1987); *Belcher Oil Co. v. M/V GARDENIA*, 766 F.2d 1508, 1512 (11 Cir.1985).

### B. Statutory Authority to Bind the Vessel Under Section 972

■ Ken Lucky also concedes that the master of the Ken Lucky, appointed by the owner, accepted the supplies. Ken Lucky contends that the master had no authority to accept the supplies and incur a lien against the vessel because of the no lien clauses in the charter agreements. However, such reasoning contradicts the language of § 972, which states that a ship's master has *presumed* authority to incur a lien. *See Atlantic & Gulf Stevedores, Inc. v. M/V Grand Loyalty*, 608 F.2d 197, 200 (5th Cir.1979) (chief engineer who ordered services possessed management powers envisioned by Act and thus had *presumed authority* as well as actual authority to incur lien).

■ A claimant's dealings with an intermediary at the port rather than a charterer or owner does not preclude the existence of a lien. *Reinholm Crane & Rigging Co., Inc. v. M/V Ocean Crown*, 484 F.Supp. 935, 936 (W.D.Wash.1979). The parties agree that the order originated from Bulkferts. Eurostem, Bulkferts' managing agent, placed the order with Brook. Marine Fuel received a telex from Gray confirming that the owner authorized the order, identifying Fillette as Ken Lucky's local (husbanding) agent. Before delivering the bunkers, Marine Fuel notified Fillette of the order and Fillette arranged for delivery of the bunkers. Fillette received a telex from Bulkferts' domestic agent, WKM Ship Management Services, stating that WKM was arranging for a purchase of bunkers in the same amount for the ship. Ken Lucky's chief engineer accepted the bunkers, acknowledging receipt, with the approval of the master. The ship's master also had presumed authority to incur a lien under the Act. The vessel certainly benefited from the bunker supply.

We conclude that this sequence of events is sufficient to establish implied authority to incur a lien against the vessel for fuel. *See Yacht, MARY JANE v. Broward Marine, Inc.*, 313 F.2d 516, 517 (5th Cir.1963) (implied authority existed because the "real" captain failed to object although he was aware of work being done for vessel); *Reinholm*, 484 F.Supp. at 936 (no objections from vessel's master, owner or charterer to obvious and prolonged services precluded summary judgment because material issue of fact remained as to the existence of implied authority); *Jan C. Uiterwyk*, 459 F.Supp. at 1330–31 (subcharterer was held to have had implied authority from the time charterer to procure the services because masters of the vessels who ordered the services were held to be agents of persons with apparent authority to bind the vessels, the time charterer and owner).

Moreover, the district court's reliance on the no lien clause to deny the lien thwarts the purpose of the statute by charging Marine Fuel with the onerous duty of resolving the ambiguities in the Sipra–Bulkferts–Eurostem–Brook relationship. *Cf. Signal Oil*, 310 U.S. at 280, 60 S.Ct. at 943 (purpose of lien act thwarted if courts compel the "material-man furnishing supplies to the vessel to resolve the ambiguities which may be found in [the charter agreements]"). We recently noted, construing a lien under the Preferred Ship Mortgage Act, that "one of the purposes of the Maritime Liens Act, 46 U.S.C. §§ 971–75 ... is to create liens in favor of those who furnish necessaries for the vessel's operation. Permitting [a] contrived financial scheme to prevail effectively destroys the liens of suppliers and subverts the purposes of the Maritime Liens Act." *Wardley Int'l Bank, Inc. v. Nasipit Bay Vessel*, 841 F.2d 259, 264 (9th Cir.1988) (citation omitted).

■ Therefore, we conclude that Marine Fuel presented sufficient evidence to establish, as an alternate basis for creation of a lien, that Marine Fuel delivered fuel for the vessel to an agent who possessed statutory authority to bind the ship. If Ken Lucky presents a defense relying on the no lien clauses to rebut this authority on remand, it must demonstrate that Marine Fuel had actual knowledge of the clauses. We remand for further proceedings to give Ken Lucky the opportunity to rebut the presumption of authority. If Ken Lucky fails to rebut the statutory presumption of authority, our finding of presumed authority

must lead to a determination that a lien arose.

On remand, Ken Lucky may attempt to rebut the statutory presumption of authority by showing that Marine Fuel waived the lien by relying on the credit of persons other than the owners and charterers to the exclusion of that of the vessel. *See, e.g., Farwest I,* 769 F.2d at 624–25. We do not reach Marine Fuel's argument that an in rem action survives even if Ken Lucky's owners or charterers are not found liable. Second, Ken Lucky may attempt to rebut the presumption of authority on remand by relying on the no lien clauses in the charter agreements. We discuss this issue below because the district court evidenced some confusion in its ruling as to the effect of such clauses.

### C. *Effect of the No Lien Clauses*

Ken Lucky admits that the purpose of the Act is to help suppliers determine who has authority to incur a lien. The Act's presumption in favor of granting liens to suppliers "was enhanced in 1971 when Congress deleted the requirement that materialmen inquire about the existence of any no-lien clauses before furnishing supplies." *Farwest I,* 769 F.2d at 623; *see Foss Launch,* 808 F.2d at 700 (one purpose of amendment was "to ensure that any party to whom the management of the vessel is entrusted will be presumed to have authority to procure necessaries and supplies which may give rise to maritime liens"); *Gulf Trading & Transp. Co. v. M/V Tento,* 694 F.2d 1191, 1194 (9th Cir.1982), *cert. denied,* 461 U.S. 929, 103 S.Ct. 2091, 77 L.Ed.2d 301 (1983). Congress was concerned that the duty of inquiry had become a "substantial obstacle" for persons furnishing supplies. H.Rep. No. 92–340, 92d Cong., 1st Sess., *reprinted in* 1971 U.S. Code Cong. & Admin.News 1363, 1364–65. *See Belcher Oil,* 766 F.2d at 1511; *Lake Union Drydock Co. v. M/V Polar Viking,* 446 F.Supp. 1286, 1289–91 (W.D.Wash. 1978); *Ryan–Walsh Stevedoring Co., Inc. v. M/V Khalij Star,* 507 F.Supp. 36, 38 (W.D.Wash.1980).

[The] duty of inquiry became quite impractical in light of the various charter-

ing and sub-chartering practices of foreign and domestic vessels. Furthermore, vessel owners and charterers engaged in subchartering activities began to insert "prohibition of lien" or "no lien" provisions in charter parties. This practice effectively shifted the risk of loss to the supplier. . . .

*Belcher Oil,* 766 F.2d at 1511; *see Atlantic,* 608 F.2d at 201 & n. 7 (no lien provisions a primary concern of the amendments).

█ The 1971 amendment obviously was directed at reducing the force of owners' and charterers' prohibition of lien clauses. Gilmore & Black, *The Law of Admiralty* § 9–39, at 669–70 (2d ed. 1975). However, Congress did not explicitly prohibit no lien clauses and the effectiveness of prohibition of lien clauses after the amendment has not been settled. *See id.* § 9–46a, at 685–86. This presents an issue of first impression in this circuit. Several courts have held that a no lien clause is not effective to rebut a statutory presumption of authority without proof of the supplier's actual knowledge of the clause. *See, e.g., Ramsay Scarlett & Co., Inc. v. S.S. Koh Eun,* 462 F.Supp. 277, 284–85 (E.D.Va.1978); *Lake Union Drydock,* 446 F.Supp. at 1291. We agree. Even though a no lien clause is present, we conclude that the purposes of the Act, in light of the 1971 amendment, would be thwarted if the actual knowledge inquiry was not undertaken.

On remand, the district court should afford Ken Lucky the opportunity to prove Marine Fuel's knowledge of the clauses. "'[T]he burden is upon the owner to show that the supplier of necessaries had actual knowledge of the existence of any lack of authority relied upon as a defense.'" *Belcher Oil,* 766 F.2d at 1512 (quoting *Jan C. Uiterwyk Co., Inc. v. M/V MARE ARABICO,* 459 F.Supp. 1325, 1331 (D.Md.1978)). "[T]he Act now requires that the owner take affirmative action to notify the supplier of necessaries that the master of a vessel or the charterer is *not* authorized to order services, the performance of which will result in the creation of liens." *Jan C. Uiterwyk,* 459 F.Supp. at 1331. Knowl-

edge that the charterer is a mere "time charterer" does not amount to actual knowledge of the time charterer's lack of authority to incur a lien for necessaries. *Ramsay Scarlett,* 462 F.Supp. at 284–85.

Ken Lucky could have easily informed Marine Fuel of the no lien clauses. Marine Fuel contends that it would not have supplied the fuel if it knew of the clauses or would have requested cash for the order. Ken Lucky could show that Marine Fuel had actual knowledge by, showing for example, that the fuel receipt had been stamped with notice of the no lien clauses or that a notice had been posted in the wheelhouse of the vessel in accordance with industry custom. When a supplier has actual knowledge of a buyer's lack of authority, the supplier can at least "make an informed business decision and may refuse to supply the vessel, make other arrangements for payment, or assume the risk." *Belcher Oil,* 766 F.2d at 1513.

## II. INTEREST

"In admiralty, interest should be granted unless there are exceptional or peculiar circumstances." *Socony Mobil Oil Co., Inc. v. Texas Coastal & Int'l, Inc.,* 559 F.2d 1008, 1014 (5th Cir.1977). Prejudgment interest compensates a claimant for the use of funds during the course of litigation if the claimant is found entitled to an award. *Rosa v. Insurance Co. of the State of Pennsylvania,* 421 F.2d 390, 393 (9th Cir. 1970); *see Western Pacific Fisheries, Inc. v. S.S. President Grant,* 730 F.2d 1280, 1288–89 (9th Cir.1984). There are no exceptional circumstances in this case to bar Marine Fuel from prejudgment interest if it is entitled to the lien. *See Alkmeon Naviera, S.A. v. M/V "Marina L",* 633 F.2d 789, 797–80 (9th Cir.1980) (trial judge's discretion to award such interest must be "exercised with a view to the right to interest") (quoting *The President Madison,* 91 F.2d 835, 845 (9th Cir.1937)); *Dow Chemical Co. v. M/V Gulf Seas,* 593 F.2d 613, 614 (5th Cir.1979) (describing exceptional circumstances cases as involving, e.g., bad faith claims, inflated damages demands or a finding of mutual fault).

On remand, the district court should award prejudgment interest if Marine Fuel establishes a lien. *General Elec. Credit & Leasing Corp. v. Drill Ship Mission Exploration,* 668 F.2d 811, 816–17 (5th Cir. 1982).

We remand for further proceedings consistent with this opinion.

REVERSED AND REMANDED.