# United States Court of Appeals
## For the First Circuit

No. 22-1844

ST ENGINEERING MARINE, LTD.,

Plaintiff, Appellee,

v.

THOMPSON, MACCOLL & BASS, LLC, P.A.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Jon D. Levy, U.S. District Judge]

Before

Rikelman, Selya, and Howard,
Circuit Judges.

James M. Bowie, with whom Thompson Bowie & Hatch LLC was on
brief, for appellant.
Lee H. Bals, with whom Marcus Clegg was on brief, for
appellee.

December 6, 2023

**SELYA**, **Circuit Judge**. Following a bench trial, the district court found that a law firm, defendant-appellant Thompson, MacColl & Bass, LLC, P.A. (TM&B), had breached its duty of care in advising its quondam client, plaintiff-appellee ST Engineering Marine, Ltd. (STEM), about the viability of a maritime lien. The district court further found that TM&B's negligence was the actual and proximate cause of STEM's loss and awarded STEM damages in the amount of $261,839.04. TM&B appeals. Affording due deference to the district court's findings of fact, we affirm.

## I

We briefly rehearse the relevant facts and travel of the case. In 2013, STEM owned the M/V Nova Star. At that time, it entered into a bareboat charter agreement for the vessel with Nova Star Cruises Ltd. (NSC). NSC assumed responsibility for all aspects of the vessel's operations and associated costs (including providing and paying for bunker fuel). It hired the ship-management company Fleetpro Ocean Inc. (Fleetpro) to operate the M/V Nova Star as its agent.

In June of 2015, Fleetpro contacted Bunkers International Corporation (BIC), a firm that arranged the delivery of fuel for charterers, to supply fuel for the M/V Nova Star. Fleetpro proceeded to send BIC purchase orders for two sales. Each purchase order laid out the details of the particular sale, listed Fleetpro "AS AGENTS FOR" NSC, and listed BIC as the "Supplier."

- 2 -

BIC thereafter engaged Sprague Operating Resources, LLC (Sprague) to supply fuel to the vessel. Neither the vessel's owner, its master, nor Fleetpro had any involvement in the selection of Sprague as the fuel vendor.

Withal, Sprague supplied fuel to the M/V Nova Star on two separate occasions. At the end of each delivery, the master and chief engineer of the vessel signed or stamped the fuel receipts. Sprague sent an invoice to BIC after each delivery ($147,354.92 for the first delivery and $149,719.68 for the second delivery). In turn, BIC sent invoices to NSC "and/or Master, Owners, Operators, Charterers, Managers, Managing Agents" for $156,460.73 and $157,729.23. Fleetpro paid BIC, but BIC filed for bankruptcy without paying Sprague.

Months later, the M/V Nova Star was arrested at the instance of a company asserting a maritime lien for unpaid services. In the ensuing melee, several other entities (including Sprague) purposed to assert maritime liens on the vessel. Pertinently, Sprague alleged that it had acquired its maritime lien of $297,074.60 upon supplying the M/V Nova Star with fuel.

With its vessel embroiled in numerous legal actions, STEM turned to TM&B for legal advice. STEM asked TM&B to analyze the flurry of lien claims and assess the validity of each claim so that STEM could decide which claims should be resisted (that is, bonded but not paid) and which claims should be settled. In mid-

November 2015, a TM&B attorney and STEM's president and in-house counsel exchanged multiple emails. The attorney advised that Sprague's lien should be honored and its claim paid. In one of his November 16, 2015, emails, the attorney added:

> Dear All,
> I have reviewed the lien claims and have requested back-up documents from the claimants. Once we get the back-up documents, I will provide my comments on the bona fide nature of the lien claims.
> . . . Sprague Energy is the provider of bunker on the order of [BIC] . . . . Sprague has attached to its complaint copies of the bunker receipts for its two deliveries, both signed by the Master. I understand that BIC is the bunker trader that filed for bankruptcy protection . . . .
> If BIC was acting as agent or broker for the ship and ordered bunkers for the ship from Sprague and then filed in bankruptcy, the fact that Fleetpro paid BIC would not help us in the lien claim filed by the innocent provide[r] that actually delivered the bunkers. Our recourse is to file a claim in the BIC bankruptcy proceeding for the amount paid to Sprague. [STEM] would in effect step into the position of Sprague claiming against BIC.

Acting on TM&B's advice, STEM proceeded to settle Sprague's claim for $267,366. It then filed a counterpart claim in the BIC bankruptcy proceeding for an equivalent sum. But in the end, STEM recovered only $5,526.96 as a result of its bankruptcy claim.

In September of 2020, STEM sued TM&B for professional negligence. STEM alleged that TM&B had advised it that Sprague possessed a valid maritime lien on the M/V Nova Star and that the

- 4 -

only way to extinguish the lien was by paying Sprague for the fuel it had supplied. In providing this advice, STEM alleged, TM&B fell below the standard of care that it owed to STEM and was negligent. As STEM saw the matter, TM&B negligently failed to advise it that the governing law was "unsettled generally and in a state of transition"; that there was no controlling decision on the issue in the District of Maine; that further investigation into Sprague's claim was needed; that STEM could try to provide security to obtain the release of the M/V Nova Star while contesting Sprague's lien claim; and that there were legal arguments that could be made to defeat Sprague's claim. Because it paid Sprague "as a direct and proximate result" of TM&B's negligent advice, STEM averred, it was entitled to recover damages from TM&B.

TM&B denied that its legal advice fell below the applicable standard of care but it did not deny that it had advised STEM that Sprague had a valid lien. Pretrial discovery ensued, followed by a three-day bench trial. The district court ruled in favor of STEM. See ST Eng'g Marine, Ltd. v. Thompson, MacColl & Bass, LLC, 633 F. Supp. 3d 354, 365 (D. Me. 2022). In the process, the court found that Sprague was a subcontractor. See id. at 357. It then found that "STEM, Nova Star Cruises, and Fleetpro did not control the selection or performance of Sprague, nor did they have

- 5 -

other dealings with Sprague apart from the routine acceptance of the delivery." Id. at 357-58.

In its conclusions of law, the court held that TM&B breached the duty of care that it owed to STEM. See id. at 361. The most recent First Circuit case concerning maritime liens at the time TM&B advised STEM (November of 2015) was Cianbro Corp. v. George H. Dean, Inc., 596 F.3d 10 (1st Cir. 2010), which established that "a subcontractor who was not directly ordered to provide necessaries can assert a lien if 'it can be shown that an entity authorized to bind the ship controlled the selection of the subcontractor and/or its performance.'" ST Eng'g Marine, 633 F. Supp. 3d at 358 (quoting Cianbro, 596 F.3d at 17). Nevertheless, TM&B predicated its advice on the older case of Tramp Oil & Marine, Ltd. v. M/V Mermaid I, 805 F.2d 42 (1st Cir. 1986), and failed to "account for Cianbro's analysis of the issue." ST Eng'g Marine, 633 F. Supp. 3d at 359-60. The court further concluded that — by not conducting legal research beyond Tramp Oil and by not rereading any of the cases cited and/or relied upon in Cianbro — TM&B furnished advice based on an "erroneous interpretation of the controlling law at the time." Id. at 361. TM&B — the district court determined — thereby failed to exercise due diligence in investigating Sprague's lien claim and, thus, breached the professional duty that it owed to STEM. See id.

The district court proceeded to find that this breach of duty proximately caused STEM's loss: "it is more likely than not that STEM would have been able to prove in the underlying arrest proceeding that BIC was not acting as an agent of STEM, Nova Star Cruises, or Fleetpro." Id. at 365. So, STEM proved "by a preponderance of the evidence that it would have prevailed in the arrest proceeding on Sprague's maritime lien claim but for TM&B's negligent advice." Id. The court concluded its decision by ordering TM&B to pay STEM $261,839.04 in damages. See id.

This timely appeal ensued.

## II

When a district court conducts a bench trial, we review de novo its legal conclusions. See United States v. 15 Bosworth St., 236 F.3d 50, 53 (1st Cir. 2001). This review encompasses "determinations about the sufficiency of the evidence." Aadland v. Boat Santa Rita II, Inc., 42 F.4th 34, 41 (1st Cir. 2022) (quoting 15 Bosworth St., 236 F.3d at 53). The district court's factual findings are, of course, reviewed for clear error. See id.; see also Fed. R. Civ. P. 52(a)(6) ("Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility."). The clear error standard is deferential and, where it applies, we will not overturn a factual finding unless — on the

- 7 -

whole of the record — we are "left with the definite and firm conviction that a mistake has been committed." <u>United States</u> v. <u>U.S. Gypsum Co.</u>, 333 U.S. 364, 395 (1948).

Although the parties do not raise the question, "we have an obligation to inquire into our subject matter jurisdiction <u>sua sponte</u>." <u>One & Ken Valley Hous. Grp.</u> v. <u>Me. St. Hous. Auth.</u>, 716 F.3d 218, 224 (1st Cir. 2013). Here, that inquiry reduces to a determination as to whether we are sitting in diversity jurisdiction or in admiralty jurisdiction.

STEM's cause of action sounds in legal malpractice (a tort arising under the common law). STEM is a business entity organized under the laws of Singapore and has its principal place of business there. TM&B is a professional services company organized under Maine law, which maintains its principal place of business in Portland, Maine. The matter in controversy comfortably exceeds the sum of $75,000.

Although questions of maritime law linger at the margins, those questions are subordinate to the alleged malpractice and the resulting injury. Put another way, the alleged negligent act and resulting injury, in combination, do not comprise the stuff needed to trigger admiralty jurisdiction. For a tort claim to come within admiralty jurisdiction, it "must satisfy conditions both of location and of connection with maritime

activity." Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 534 (1995).

Here, the location requirement has not been satisfied. The alleged tort (the allegedly negligent advice) occurred on land. And as we have recently explained, "[w]hen . . . the 'injury suffered' is on 'land,'" it must be shown "that 'a vessel on navigable water' caused the tort." Rhode Island v. Shell Oil Prods. Co., 35 F.4th 44, 61 (1st Cir. 2022) (quoting Jerome B. Grubart, Inc., 513 U.S. at 534). STEM suffered its injury on land, and it was an attorney's advice — not a vessel on navigable waters — that is alleged to have caused the tort.

Given this collocation of facts, we hold that this lawsuit arises in diversity jurisdiction. See 28 U.S.C. § 1332(a)(2). The case simply does not present the conditions required to invoke admiralty jurisdiction.

This determination, in turn, controls our choice of law. Because the case is in a federal court by virtue of diversity jurisdiction, state law supplies the substantive rules of decision. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); Conformis, Inc. v. Aetna, Inc., 58 F.4th 517, 528 (1st Cir. 2023). The parties agree that the law of Maine controls, and we accept that reasonable agreement. See Borden v. Paul Revere Life Ins. Co., 935 F.2d 370, 375 (1st Cir. 1991). We caution, though, that when we address the questions of maritime law that are embedded in

- 9 -

this controversy, we look to federal maritime law and precedents — as Maine courts would likewise do. See, e.g., Offshore Logistics, Inc. v. Tallentire, 477 U.S. 207, 223 (1986) (explaining that state law is constrained by what some have called the reverse-Erie doctrine, "which requires that the substantive remedies afforded by the States conform to governing federal maritime standards").

## A

Under Maine law, a plaintiff seeking to prove attorney malpractice "must show (1) a breach by the defendant of the duty owed to the plaintiff to conform to a certain standard of conduct; and (2) that the breach of that duty proximately caused an injury or loss to the plaintiff." Brooks v. Lemieux, 157 A.3d 798, 802 (Me. 2017) (quoting Pawlendzio v. Haddow, 148 A.3d 713, 715 (Me. 2016)). TM&B challenges the district court's determination that it breached the duty of care that it owed to STEM. It also challenges the district court's determination that any such breach was an actual and proximate cause of the injury to STEM. We address these challenges separately.

## B

We start with the district court's determination regarding breach of duty. In Maine, the duty of care owed by an attorney to his client is the use of "such skill, prudence and diligence as is reasonable according to the standards of ordinarily

competent lawyers performing similar services under like conditions." Pawlendzio, 148 A.3d at 715 (quoting Sohn v. Bernstein, 279 A.2d 529, 532 (Me. 1971)).

TM&B argues that the district court erred in concluding that it breached the duty it owed to STEM. In TM&B's view, it exercised reasonable skill, prudence, and diligence when it advised STEM that Sprague had a valid lien claim.

Notably, TM&B does not contest the district court's determination that its advice to STEM was predicated on Tramp Oil. It continues to argue that Tramp Oil was (and is) the most relevant precedent. Building on this foundation, it argues that the advice that it provided to STEM was correct. In the process, it takes issue with the district court's conclusion that Cianbro, not Tramp Oil, is controlling. See ST Eng'g Marine, 633 F. Supp. 3d at 360.

We review for clear error the district court's finding that TM&B breached its duty of care to STEM. See Fairest-Knight v. Marine World Distribs., Inc., 652 F.3d 94, 98 (1st Cir. 2011). Embedded within this clear-error review is a legal determination as to what was in November of 2015 the most recent and relevant law, when viewed through the eyes of a reasonably skillful, prudent, and diligent attorney. We review this embedded question of law de novo. See Aadland, 42 F.4th at 41.

For a start, we discern no clear error in the district court's determination that TM&B breached its duty of care to STEM.

The record, fairly read, supports a finding that the legal research that TM&B's attorney conducted in examining Sprague's lien claim was not carried out with sufficient care and attention as would be expected of a reasonably skillful, prudent, and diligent lawyer. So, too, the fact that the TM&B attorney did not alert STEM to the unsettled nature of maritime lien law in the First Circuit supports the district court's finding of negligence. Had he conducted a more careful and attentive canvass of the case law, he would have identified at least three reasons why a cloud of uncertainty hung over the Tramp Oil dicta upon which he relied. Given this cloud of uncertainty, a reasonably skillful, prudent, and diligent attorney would have explicitly hedged his advice, apprising STEM of the unsettled nature of the law in this area.

First, a reasonably skillful, prudent, and diligent attorney would have understood that the statements in Tramp Oil were dicta. There, Logos Shipping APS, a charterer of a vessel, asked J&L Bunkers A/S (J&L) to arrange fuel for the chartered vessel. See Tramp Oil, 805 F.2d at 44. J&L then contacted Tramp Oil and Marine, Ltd. (Tramp), a fuel broker. See id. Tramp contracted with Exxon International (Exxon), which caused Colonial Oil Industries, Inc. (Colonial) to supply the fuel to the vessel. See id. Once the fuel was supplied, Tramp paid Exxon in full — but did so without any authorization from the owner or charterer of the vessel. See id. at 44-45. After J&L failed to repay Tramp

in full, Tramp claimed that it had acquired a maritime lien. See id. at 44. By paying Exxon, Tramp asserted it had made an "advance" on behalf of the vessel. Id. at 45. And pursuant to the rule of advances, it professed to have acquired the lien that Exxon had previously held. See id.

We rejected Tramp's contention, explaining that Tramp had acted without authorization from either the vessel's owner or any other person with proper authority. See id. at 45-46. We added, as an aside, that "[n]o one disputes that Exxon and Colonial, as direct suppliers of the fuel to the [vessel], would be entitled to a maritime lien. Fuel is unquestionably a 'necessary' within the meaning of the Act, and it was furnished upon the order of someone with authority to do so."[1] Id. at 44. Later in the opinion, we wrote that "Tramp's payment was used to satisfy an outstanding lien claim." Id. at 45. In other words, we implied that both Exxon and Colonial had valid and outstanding lien claims.

As a reasonably skillful, prudent, and diligent attorney would have realized, these last two statements were plainly dicta. See Lake Charles Stevedores, Inc. v. Professor Vladimir Popov MV,

_____

[1] The Act discussed in Tramp Oil (and in effect at that time) was the Federal Maritime Lien Act, the predecessor to the Commercial Instruments and Maritime Liens Act (CIMLA), 46 U.S.C. §§ 31301-31343. The CIMLA was in effect at all times relevant to the case at hand.

199 F.3d 220, 230 (5th Cir. 1999) (reaching this conclusion). In Tramp Oil, we were not asked to address the viability of these lien claims. Accordingly, our statement that "[n]o one disputes that Exxon and Colonial . . . would be entitled to a maritime lien," 805 F.2d at 44, was not intended to be read as a general pronouncement of law. Seen in this light, a reasonably skillful, prudent, and diligent attorney would have understood that it would not be safe to rely on the Tramp Oil dicta as binding pronouncements.

Second, we discern no clear error in the district court's finding that the TM&B attorney failed to conduct adequate legal research. See ST Eng'g Marine, 633 F. Supp. 3d at 361. In reaching this conclusion, we think that the district court must have regarded the TM&B attorney's primary misstep as failing to conduct research with an adequate level of care and attention. The record supports a conclusion that — had TM&B's attorney read the relevant case law with the requisite degree of care and attention — he would have discovered that the other courts of appeals that had addressed the matter all had departed from his reading of Tramp Oil's dicta when determining the circumstances in which a direct supplier of a necessary acquires a maritime lien.

On TM&B's reading, Tramp Oil stands for the proposition that as long as a supplier provides a necessary to a vessel and does so pursuant to an order that was initially issued by a

vessel's owner or a person authorized by the owner, the supplier is entitled to a maritime lien. This is true, TM&B asserts, even if the order is relayed through multiple layers of intermediaries, each of whom passes along the entire order for a traditional necessary that originated from the vessel.

A reasonably skillful, prudent, and diligent attorney conducting adequate legal research would have realized that — by November of 2015 — the courts of appeals had moved away from this interpretation of the provision in the Commercial Instruments and Maritime Liens Act (CIMLA), which states that "a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner . . . has a maritime lien on the vessel." 46 U.S.C. § 31342(a). Those courts had held — contrary to Tramp Oil's dicta — that, in order to be considered to have provided a necessary "on the order of the owner or a person authorized by the owner," a supplier must do more than simply deliver a necessary. Some additional connection with a person authorized to bind the vessel must be shown.

To be sure, this essential connection can be forged in a variety of ways. One way is through privity of contract with the owner or a person authorized by the owner. Cf. Farwest Steel Corp. v. Barge Sea-Span 241, 828 F.2d 522, 525-26 (9th Cir. 1987) (holding that subcontractor — who lacked privity of contract with owner or person authorized by owner — did not have claim to lien

when general repair contractor who hired him failed to pay him for his services).  Another way is by showing that the supplier has been explicitly "nominated by the owner" of the vessel to provide a necessary, Marine Fuel Supply & Towing, Inc. v. M/V Ken Lucky, 869 F.2d 473, 475 (9th Cir. 1988), and demonstrating that the necessary has been directly "sold to" a person with authority to bind the vessel, id. at 477 (emphasis in original).  A third way is by involvement with an owner or a person authorized by the owner in a manner that was "significant and ongoing during the pertinent transaction."  Galehead, Inc. v. M/V Anglia, 183 F.3d 1242, 1245 (11th Cir. 1999).

Although these three ways differ from each other, there is a common denominator:  all of the relevant case law teaches that merely being the supplier of a necessary does not suffice to acquire a maritime lien.  The short of it is that, among the decided cases, the general trend as of November of 2015 was pointing away from Tramp Oil's dicta.

Third, had TM&B's attorney conducted more careful and attentive research — as a reasonably skillful, prudent, and diligent attorney would have done — he would have understood that our most recent case on maritime liens, Cianbro, cast Tramp Oil's dicta in grave doubt.  In Cianbro, the Hornbeck entities contracted with the Cianbro Corporation (C-Corp.) to convert their two sulfur tankers into multi-purpose supply vessels.  See 596 F.3d at 12.

- 16 -

C-Corp., in turn, contracted with Hub Technologies, Inc. (Hub) to fabricate certain steel components that were to be used in the conversion work. See id. Hub then subcontracted with Dean Steel (Dean) to perform some of the initial cutting work on the steel. See id. at 13. C-Corp. shipped raw steel directly to Dean, and Dean returned the cut material to Hub, which fabricated the components that C-Corp. had ordered. See id. After Hub failed to pay Dean and filed for bankruptcy, Dean claimed maritime liens on the vessels. See id. The district court rejected Dean's claim, holding that it failed to satisfy several of the requirements for a maritime lien. See id. at 14.

We upheld the district court's decision. See id. at 18. Among other things, we rejected Dean's claim that it had acted "on the order of the owner or a person authorized by the owner," as required by CIMLA. Id. at 16-18. Dean's claim that C-Corp. had the authority to bind the vessels' owners, we explained, "would strain the language and purpose of the Maritime Lien Act." Id. at 17. In addition, we determined, that Dean's claims fared no better under the Fifth Circuit's analysis of CIMLA and its so-called middleman line of cases.[2] See id. Dean was unable to show "that

---

[2] In Lake Charles Stevedores, 199 F.3d at 228-29, the Fifth Circuit differentiated between the general contractor/subcontractor line of cases and the middleman line of cases in assessing whether a supplier of a necessary has acted "on the order of the owner or a person authorized by the owner." The former line of cases involves instances in which an owner or agent

an entity authorized to bind the ship controlled [its] selection . . . and/or its performance." Id. (quoting Lake Charles Stevedores, 199 F.3d at 229).

Had TM&B's attorney given due weight to Cianbro — we think it reasonable to conclude, as did the district court — that he would have had second thoughts about the persuasive force of Tramp Oil's dicta. Although our discussion of the middleman line of cases in Cianbro was not a model of clarity, it is apparent that the Cianbro court concluded that a supplier does not acquire a maritime lien simply by virtue of providing a necessary. Some additional connection with a person authorized to bind the vessel must be shown. Cianbro's narrow reading of the term "on the order

---

of a vessel hires a general contractor to complete a task and the contractor solicits subcontractors for assistance in completing the work. See id. at 229. A subcontractor lacking privity of contract with the "owner or a person authorized by the owner" can acquire a lien if "it can be shown that an entity authorized to bind the ship controlled the selection of the subcontractor and/or its performance." Id.

In contrast, the middleman line of cases involves instances in which an owner or agent of a vessel employs a broker to find a third party to complete a job that it needs done. See id. at 229 ("The primary distinguishing characteristic between a general contractor and a middle-man . . . is that a general contractor can be expected to supply the necessary itself, whereas a middle-man is not expected to do so."). In such cases, a court must assess "the nature of the relationship between each pair of entities that are involved in the transaction at issue (e.g., agent vs. independent contractor)" in determining whether a supplier lacking privity can acquire a lien. Id. at 230. It is this test — and not "whether an intermediary can be expected to supply the necessaries itself" — that determines whether a supplier has a valid lien claim. Id.

of the owner or a person authorized by the owner" is consistent with both our favorable citation to Fifth Circuit precedent and our steadfast adherence to the "well-established precept that the requirements for the allowance of a maritime lien are strictly construed." Cianbro, 596 F.3d at 14.

TM&B's contrary contentions are unconvincing. It conspicuously avoids any consideration of whether Sprague would qualify for a maritime lien under the analysis put forth in Lake Charles Stevedores, 199 F.3d at 230, the most pertinent Fifth Circuit precedent. When analyzing whether a middleman qualifies for a maritime lien, what is crucial "is not whether an intermediary can be expected to supply the necessaries itself that distinguishes instances in which the actual suppliers have liens, but it is rather the nature of the relationship between each pair of entities that are involved in the transaction at issue (e.g., agent vs. independent contractor)." Id.

TM&B avoids this analysis for two obvious reasons. For one thing, the analysis undermines TM&B's overarching argument that a supplier acquires a lien merely by virtue of providing the necessary. For another thing, the analysis paves the conceptual path for understanding why TM&B's advice that Sprague had a valid lien claim was incorrect. After all, the nature of the relationship between Sprague and the only three entities authorized to bind the M/V Nova Star (STEM, NSC, and Fleetpro) was

not one of agency — and the district court so found. See ST Eng'g Marine, 633 F. Supp. 3d at 357. It follows inexorably that — under the test articulated in Lake Charles Stevedores — Sprague did not have a valid lien claim.

At oral argument, TM&B placed great emphasis on the Ninth Circuit's decision in Ken Lucky, 869 F.2d at 473. But that decision offers scant support for TM&B's reading of the law. There, as in this case, an intermediary was used in ordering the fuel. See id. at 476. Even so, the role of that intermediary did not factor into the Ken Lucky court's analysis because the lien challenger admitted that the fuel was ordered by and sold to a person with authority to bind the vessel. See id. at 477. Here, by contrast, Sprague sold the fuel to BIC, which was not authorized to bind the vessel.

Nor does TM&B's reliance on the legislative history of CIMLA gain it any headway. This history, it argues, demonstrates that "American companies like Sprague that supply traditional necessaries directly to foreign vessels on an order that originated from the vessel were the intended beneficiaries of the Lien Act." Whether or not such a reading of the legislative history is correct — a matter on which we take no view — we do not rely on legislative history alone to interpret statutory text.[3] See, e.g., Chamber of

_____

[3] To the extent that Tramp Oil relied on legislative history, at least one other court of appeals has thrown shade on its

- 20 -

Com. of U.S. v. Whiting, 563 U.S. 582, 599 (2011) ("Congress's 'authoritative statement is the statutory text, not the legislative history.'") (quoting Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 568 (2005)).

That ends this aspect of the matter. We hold that, by November of 2015, Tramp Oil's dicta as to how a direct supplier of a necessary could acquire a maritime lien were on life support. Here, moreover, the record supports the district court's finding that TM&B's attorney failed to conduct adequate legal research — research that, when properly evaluated, would have exposed the frailty of Tramp Oil's dicta. The record also supports a finding that TM&B's attorney did not appropriately counsel his client about the cloud of uncertainty that hovered over Sprague's lien claim.[4]

---

analysis. See Triton Marine Fuels Ltd. v. M/V Pacific Chukotka, 575 F.3d 409, 418 (4th Cir. 2009) ("Tramp Oil relies on a misreading of the FMLA's legislative history.").

[4] Maine's highest court has not spelled out what standard of care a reasonably skillful, prudent, and diligent attorney owes to his client when confronted with an area of law that is unsettled. Some jurisdictions hold that an attorney fulfills his duty of care by conducting adequate legal research and exercising reasonable judgment when dealing with an unsettled area of law. See, e.g., Kempf v. Magida, 832 N.Y.S.2d 47, 49 (N.Y. App. Div. 2007). Other jurisdictions require an attorney to alert his client that there is an unsettled question of law and inform his client as to any adverse outcome that could arise should the law subsequently be decided contrary to his view. This requirement stems from the attorney's obligation to afford his client "the opportunity to assess the risk" and make an educated decision. Williams v. Ely, 668 N.E.2d 799, 806 (Mass. 1996). For present purposes, we need not make an "informed prophecy" as to which rule the Maine Supreme Judicial Court would adopt. Blinzler v. Marriott Int'l, Inc., 81

We thus decline to disturb the district court's conclusion that TM&B failed to exercise "such skill, prudence and diligence as is reasonable according to the standards of ordinarily competent lawyers performing similar services under like conditions." Pawlendzio, 148 A.3d at 715. Thus, we hold that the district court did not clearly err when it found that TM&B breached the professional duty that it owed to STEM. See ST Eng'g Marine, 633 F. Supp. 3d at 361.

Let us be perfectly clear. An attorney is not an insurer, liable for professional negligence simply because his advice proves to be incorrect. The standard of care expected of an ordinarily competent attorney is not omniscience. Instead, it is the exercise of a reasonable level of skill, prudence, and diligence in conducting research and advising his or her client. The district court's finding that TM&B's performance undershot this standard was not clearly erroneous. Cf. Cumpiano v. Banco Santander P.R., 902 F.2d 148, 152 (1st Cir. 1990) (explaining that when reviewing for clear error, "we ought not to upset findings of fact or conclusions drawn therefrom unless, on the whole of the record, we form a strong, unyielding belief that a mistake has been made").

_____

F.3d 1148, 1151 (1st Cir. 1996). In this instance, TM&B failed to satisfy either standard.

- 22 -

Our voyage is not yet finished. What remains is for us to examine the district court's finding that the negligence of TM&B's attorney proximately caused STEM's loss.

We begin with first principles. "[I]n a legal malpractice case, once a plaintiff demonstrates that the defendant attorney was negligent, the plaintiff must show that that negligence actually and proximately caused his or her injury." Wheeler v. White, 714 A.2d 125, 127 (Me. 1998). To prove causation, "a plaintiff must demonstrate that he or she would have achieved a more favorable result but for the defendant's alleged legal malpractice." Niehoff v. Shankman & Assocs. Legal Ctr., P.A., 763 A.2d 121, 124 (Me. 2000). "[T]he plaintiff typically proves that the attorney's professional negligence caused injury to the plaintiff by presenting evidence of what would have happened in the underlying action had the attorney not been negligent." Reppucci v. Nadeau, 238 A.3d 994, 999 (Me. 2020) (quoting Brooks, 157 A.3d at 804).

TM&B strives to convince us that the district court clearly erred in finding that it was more likely than not that STEM would have prevailed in contesting Sprague's lien claim but for TM&B's advice. TM&B suggests that this finding was clearly erroneous in two ways. First, it contends that Sprague's lien was valid: the finding that Sprague was not selected or controlled by

STEM, NSC, or Fleetpro was not, as TM&B sees it, based on sufficient evidence. Second, TM&B contends that the district court should not have regarded the advice that TM&B gave to STEM concerning Sprague's maritime lien claim as dispositive.

Neither contention moves the needle. The district court did not clearly err when it found the allegations that Sprague put forth in its complaint — including that BIC was authorized to bind the vessel — to be just that: allegations made "after-the-fact" and "on information and belief." ST Eng'g Marine, 633 F. Supp. 3d at 364. Allegations are not evidence, and the district court was at liberty to find — as it did — that the revealed facts discredited Sprague's allegations.

So, too, the district court did not clearly err in affording little weight to STEM's allegation in the BIC bankruptcy proceeding that BIC was paid as an intermediary. See id. at 364-65. This allegation was riddled with factual errors and it shed little light on whether STEM, NSC, or Fleetpro agreed that BIC would operate as an agent on their behalf. Similarly, the district court did not commit clear error when it rejected TM&B's claim that the language in the Fleetpro purchase order directing BIC to coordinate the delivery of fuel with the vessel's master signified that BIC was an agent of STEM, NSC, or Fleetpro. See id. at 365. Nothing in this purchase order suffices to prove that BIC had an agency relationship with STEM, NSC, or Fleetpro. In fact — and as

the district court found, see id. — this purchase order listed Fleetpro "AS AGENTS FOR" NSC and BIC as the "Supplier," thus dispelling any notion that either BIC or Sprague was acting as an agent for STEM, NSC, or Fleetpro, id. at 357.

Nor did the district court clearly err when it rejected the claim that Sprague's fuel delivery receipts evinced the fact that those in charge of the vessel knew that Sprague was asserting a lien. These receipts, as the district court found, "reflect nothing more than the vessel's acceptance of the deliveries." Id. at 365.

TM&B's contention that its advice was not the actual cause of STEM's loss is equally unavailing. In support, TM&B claims that the conditional nature of its advice in one of its November 16, 2015, emails "did not . . . foreclose the possibility that BIC might not have been authorized to pass along an order on behalf of the vessel." It also claims that STEM's conduct obstructed TM&B's ability to evaluate the asserted liens.

None of these claims withstand scrutiny. The record supports a conclusion that TM&B was focused only on whether the order that BIC placed with Sprague "originated" with the vessel; and whether the fuel was actually delivered. Yet those two factors alone were not sufficient to determine whether Sprague had a valid maritime lien. See supra Part II(B). Although TM&B hedged its advice regarding BIC on the assumption that BIC was acting as an

agent or a broker, this advice was faulty in the first instance. The conditional nature of TM&B's advice thus fails to shield it from liability. By like token, even if STEM assumed responsibility for collecting documents that would have been of relevance in analyzing Sprague's lien claim, that fact would not discharge TM&B of its responsibility for the advice that it provided. And the fact that STEM, not TM&B, opted to pursue expedited settlement of the lien claim does not change the equation.

We thus hold that the district court did not clearly err when it determined that STEM had proven by a preponderance of evidence that it would have prevailed in the arrest proceedings on Sprague's maritime lien claim but for TM&B's errant advice.

## III

We need go no further. For the reasons elucidated above, the judgment of the district court is

**Affirmed**.